[No. B050632. Second Dist., Div. One. June 28, 1991.]

SUMITA CHATTERJEE, Plaintiff and Appellant, v.
KENNETH W. KIZER, as Director, etc., Defendant and Respondent.

**[Opinion certified for partial publication.†]**

†Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of contentions III and IV and discussion parts III and IV.

1350

## COUNSEL

Joy Young Stephenson for Plaintiff and Appellant.

Daniel E. Lungren, Attorney General, Robert L. Mukai, Acting Chief Assistant Attorney General, Charlton G. Holland, Assistant Attorney General, John H. Sanders and Phyllis A. Coven, Deputy Attorneys General, for Defendant and Respondent.

## OPINION

**SPENCER, P. J.—**

### INTRODUCTION

Plaintiff Sumita Chatterjee appeals from an order denying her petition for writ of mandate to compel defendant Kenneth Kizer, M.D., as Director of the Department of Health Services, to set aside his order denying her Medi-Cal benefits for the period of September 1985 through September 1986.

### STATEMENT OF FACTS

Plaintiff applied to Los Angeles County (county) for Medi-Cal benefits based on disability on September 19, 1985. The county forwarded her claim to the Disability Evaluation Division (DED) of the State Department of Health Services (department). The DED determined plaintiff was not disabled; on that basis the county denied her Medi-Cal benefits based on disability.

On April 1, 1986, plaintiff requested a fair hearing from the department; it was held on June 11, 1986. Administrative Law Judge (ALJ) Mike Ossola concluded in his proposed decision plaintiff was disabled and the county's action in denying her Medi-Cal benefits must be set aside. However, defendant did not adopt the proposed decision but ordered that another hearing be held pursuant to Welfare and Institutions Code section 10959. The reason for the further hearing was "to reevaluate [plaintiff's] medical condition and disability status in light of pertinent medical evidence to determine whether [she qualified for Medi-Cal] benefits."

The second hearing was held on April 8, 1987, before ALJ Jack Flanders. He concluded in his proposed decision that plaintiff was disabled from September 1985 to September 1986, and the county's action in denying her Medi-Cal benefits for that period must be set aside. Again, the proposed decision was not adopted by defendant, but he ordered another hearing pursuant to Welfare and Institutions Code section 10959 "to receive additional medical evidence of [plaintiff's] condition."

A third hearing was held on October 28, 1987, before ALJ Patrick Coony. He concluded that while plaintiff was critically ill in September 1985, she had the capacity to return to work in April or May 1986; since the seriousness of her condition did not last a full 12 months, she could not be considered disabled. His proposed decision, dated March 7, 1988, was adopted by defendant on March 14, 1988.

Plaintiff then brought the instant action. The trial court denied her petition for writ of mandate. After applying the independent judgment test, the trial court found: "The evidence is clear that petitioner [plaintiff] fell seriously ill in [September 1985] with lupus characterized by fatigue and bleeding secondary to a severely reduced platelet count. Petitioner was hospitalized for two weeks, and thereafter was cared for at home by her physician husband and other relatives. Her condition gradually improved, and shortly after [September 1986] she became pregnant. The testimony indicates that this pregnancy was planned.

". . . A necessary element of petitioner's claim to MediCal benefits is proof that petitioner was disabled for a full twelve months. An episode of serious illness alone does not qualify one for benefits.

". . . The thrust of petitioner's claim of disability is that due to her reduced platelet count, she was at great risk of severe bleeding as [a] result of strain or trauma and therefore could not risk working. The claim with regard to the platelet problem is not that petitioner could not work, but rather that it was too dangerous for her to work, and that this condition of danger persisted for a full year. While this would not establish a disability in the sense of inability to work, this court will assume that such a condition of danger qualifies as a disability. The evidence indicates, however, that petitioner became pregnant at about the end of the alleged one year period of disability (the precise date petitioner became pregnant is not revealed). We thus know that petitioner was seriously ill and in severe danger of bleeding in [September 1985]. We also know that the danger of bleeding had sufficiently subsided and that petitioner was sufficiently healthy to become pregnant shortly after [September 1986]. We have no specific evidence about the course of petitioner's recovery and about her condition as time progressed from her serious illness to her recovery to a degree sufficient to allow for a pregnancy . . . . Petitioner also claimed fatigue, depression and water retention as causes of disability. Similar to the bleeding danger contention, however, we do not know the specifics of the course of her illness.

". . . On the evidence in the record, it is not possible to determine whether or not petitioner was disabled for the requisite 12 month period. In addition, her apparently planned pregnancy beginning shortly after the lapse of the 12 month period in issue militates against a finding of 12 full months of disability. Since petitioner bears the burden of proving 12 full months of disability, the question here is decided by petitioner's failure to meet that burden."

Plaintiff's medical records from Los Angeles County-USC Medical Center show she was admitted to the hospital on September 11, 1985. She was

diagnosed with systemic lupus erythematosus and immune thrombocytopenic purpura, was suffering from gingival bleeding, was noted to have petechiae on her arms and legs, and her platelet count was 1,000. She was treated and her platelet count increased to 19,000.[1] She was put on oral steroids—30 milligrams of prednisone twice daily—and discharged on September 17. Dr. Joanna M.S. Davies, the resident treating her, recommended that she not return to her usual occupation for 12 months.

Plaintiff's records from Kaiser Permanente Medical Group show that she was seen on April 7, 1986 for a viral illness. Aside from that illness, she was feeling well, her lupus was stable, her platelet count was 340,000 and she was taking 15 milligrams of prednisone four times daily. On May 29, 1986, she felt well and was taking the same dosage of prednisone; she also had a pregnancy test which came back positive. However, on June 2, 1986, she was seen again after apparently suffering a miscarriage. On August 22, 1986, a blood count showed her platelet count to be 274,000 and there was some question as to whether her lupus activity was increasing. She was seen again on March 9, 1987; at that time her lupus was stable, she was taking the same dosage of prednisone, and she was pregnant and due in July. She delivered a healthy baby boy on July 11, 1987.

Plaintiff also had medical records from Good Samaritan Hospital and Health Center in Dayton, Ohio. She was admitted on January 5, 1984 with nonspecific gastritis and systemic lupus erythematosus and discharged on January 7, 1984.

A residual functional capacity assessment from November 1985 indicated plaintiff had limited physical capacities: she could lift a maximum of twenty pounds and frequently lift or carry a maximum of ten pounds, stand or walk about six hours in an eight hour day and sit about six hours per eight-hour day. Only occasionally could she climb, balance, stoop, kneel, crouch or crawl.

A residual functional capacity assessment from September 1987 indicated plaintiff could lift a maximum of fifty pounds and frequently lift or carry a

---

[1]Systemic lupus erythematosus is a generalized connective tissue disorder characterized by a variety of symptoms, including skin lesions and immunologic phenomena. (The Sloane-Dorland Ann. Medical-Legal Dict. (1987) p. 423.) Purpura is a group of disorders characterized by skin discolorations resulting from hemorrhage into the tissues; small hemorrhages are called petechiae. (*Id.* at p. 594.) Thrombocytopenic purpura is a disease characterized by thrombocytopenia, a decrease in the number of blood platelets, which play a role in blood coagulation. (*Id.* at pp. 555, 595, 729.) A normal platelet count ranges from 150,000 to 400,000 per cubic millimeter. (See The Merck Manual (14th ed. 1982) pp. 2183, 2197.) A platelet count under 10,000 per cubic millimeter indicates severe thrombocytopenia. (*Id.* at p. 1095.)

maximum of twenty-five pounds, stand or walk about six hours in an eight-hour day and sit a total of six hours per eight-hour day. No other restrictions were placed on her work. The report noted she had just had a baby and her lupus was quiescent.

At the first administrative hearing, on June 11, 1986, plaintiff testified she was 25 years old. She had a master's degree and was working on her doctorate in India when she married and came to the United States in December 1983. She last worked in 1983 in India as an industrial psychologist but left that job when she married. She and her husband lived in Dayton, Ohio for a year, then came to Los Angeles when he got a job here. She planned to continue her education and look for a job in Los Angeles and had begun taking courses at a college when she was hospitalized in September 1985.

Plaintiff's husband, Dr. Satyabrata Chatterjee, testified that plaintiff's lupus had manifested itself in 1984 as lupus gastritis, causing vomiting and abdominal pain. In September 1985, it manifested itself as thrombocytopenia purpura, reducing her platelet count from about 100,000 to 1,000 or less; 1,000 was the lowest count the computer could read. Platelets help blood to clot; without platelets, one can bleed to death spontaneously, without any trauma. Plaintiff was bleeding from her gums, and Dr. Chatterjee and plaintiff's doctors were worried she might bleed inside her brain, which would have been fatal. The doctors attempted a transfusion but were unable to perform it, so their only recourse was to place plaintiff on a high dosage of steroids, which could cause many side effects. Plaintiff did respond to the steroids after four or five days but began getting very depressed, a side effect of the steroids.

Upon her discharge, Dr. Chatterjee testified, it was advised that plaintiff be considered disabled for a year and not have any physical or mental strain. This was both because of the depression and because, with the thrombocytopenia, plaintiff ran a risk that, whatever she did, even sitting down on a chair, she would begin to bleed. The doctors worried that any form of physical work, even that which did not involve trauma, could cause a fatal bleed. For that reason, they recommended that plaintiff take steroids for a year and not be subjected to any form of trauma or strain.

Plaintiff added that she had seen her doctor recently and he had not given her a definite prognosis. At that time, she was spending most of her time at home reading or watching television; however, she had to take breaks from these activities because she became tired or developed a headache. Friends helped her around the house. She had difficulty sleeping and at some point was really depressed and crying a lot.

At the second administrative hearing, on April 8, 1987, Dr. Chatterjee further testified when plaintiff was hospitalized and a transfusion attempted, she had a severe, anaphylactic reaction[2] and "had to be coded." She was put on intravenous steroids, prednisolone; she took intravenous steroids for about 10 days, during which time she was "mentally out of it" and incoherent. After an increase in the dose of steroids she began to respond. When her platelet level reached 20,000 or 25,000, she was able to go home, after about two weeks in the hospital.[3]

After plaintiff went home, Dr. Chatterjee took care of her; plaintiff would not see any other doctors. Dr. Chatterjee had his parents come from India to help plaintiff while she was taking heavy doses of steroids; they stayed until January 1987. Plaintiff's steroids were gradually reduced starting in mid-1986; until then she had been taking 20 or 30 milligrams per day, but by the hearing date she was taking only 15 milligrams per day. Because plaintiff had become pregnant in November 1986, he did not take her off steroids entirely; it would have been too risky.

When plaintiff became pregnant, she returned to India for her father, a doctor, to take care of her; Dr. Chatterjee was too busy with his work and did not have the time to do so himself. She returned in March 1987 and was seeing a gynecologist at Kaiser Permanente who specialized in treating high-risk pregnancies.

Plaintiff testified that her first month home from the hospital, she stayed in her bed, getting up only to eat or use the bathroom. After that, for six to eight months, she would get up, sit and watch television, occasionally go out with her husband. However, because of the lupus, Dr. Chatterjee testified, when plaintiff went out into the sun she would get a rash on her face. Plaintiff's doctors did not want her to go out in the sun at all.

Plaintiff also had difficulty going up stairs, and it took her a long time to do so. The steroids she was taking caused fluid to accumulate in her body, including her chest, which precluded her from walking up stairs normally. This was a major problem for seven or eight months after her hospitalization and continued to some degree through November 1986.

Additionally, during that first year out of the hospital, plaintiff did not stoop or bend over, crawl, crouch or kneel. This was to prevent the risk that

[2]An anaphylactic reaction is an unusual or exaggerated allergic reaction to a foreign protein or other substance. (The Sloane-Dorland Ann. Medical-Legal Dict., *supra*, at p. 27.)

[3]According to hospital records, however, plaintiff was hospitalized from September 11 through September 17, 1985—only one week.

gravity would cause blood to accumulate in the brain and the intracranial pressure would cause spontaneous bleeding.

Petitioner also testified her master's degree was in psychology and she received it from Delhi University in India. She worked for six months in India before she and Dr. Chatterjee married and she came to the United States.

## CONTENTIONS

### I

Plaintiff contends an independent review shows the trial court erred prejudicially by failing to consider whether defendant acted properly in setting aside not one but two favorable decisions by two ALJ's.

### II

Plaintiff further contends an independent review shows the trial court erred prejudicially by basing its decision on the erroneous conclusion a claimant must be disabled for 12 consecutive months to be eligible for Medi-Cal benefits.

### III, IV*

. . . . . . . . . . . . . . . . . . . . . . . . . .

## DISCUSSION

### I

Plaintiff contends an independent review shows the trial court erred prejudicially by failing to consider whether defendant acted properly in setting aside not one but two favorable decisions by two ALJ's. We disagree.

■ Preliminarily, it is necessary to clarify the standard of review. The trial court's review of defendant's decision denying plaintiff's application for disability benefits pursuant to her petition for a writ of administrative mandate (Code Civ. Proc., § 1094.5) was governed by the independent judgment rule. (*Frink* v. *Prod* (1982) 31 Cal.3d 166, 180 [181 Cal.Rptr. 893, 643 P.2d 476]; *Cooper* v. *Kizer* (1991) 230 Cal.App.3d 1291, 1296 [281

*See footnote, *ante*, page 1348.

Cal.Rptr. 421], rehg. den. June 11, 1991.) It was required to reconsider the evidence and make its own independent findings of fact. (*Harlow* v. *Carleson* (1976) 16 Cal.3d 731, 735 [129 Cal.Rptr. 298, 548 P.2d 698].)

■ On appeal, our review of the trial court's judgment is governed by the substantial evidence rule and we must determine " '"whether the findings and judgment of the trial court are supported by substantial, credible and competent evidence." ' " (*Evans* v. *Unemployment Ins. Appeals Bd.* (1985) 39 Cal.3d 398, 407 [216 Cal.Rptr. 782, 703 P.2d 122], citations omitted; *Cooper* v. *Kizer, supra*, 230 Cal.App.3d at p. 1299.) All conflicts in the evidence must be resolved and all inferences drawn in favor of the judgment. (*Board of Education* v. *Jack M.* (1977) 19 Cal.3d 691, 697 [139 Cal.Rptr. 700, 566 P.2d 602]; *Nestle* v. *City of Santa Monica* (1972) 6 Cal.3d 920, 925-926 [101 Cal.Rptr. 568, 496 P.2d 480].) However, we are not bound by the trial court's determination of questions of law but may make our own independent determinations. (*Evans, supra*, at p. 407.) Hence, the only "independent review" this court makes is of the legal principles applicable to the case, to determine whether the correct principles were applied below.

■■ Plaintiff contends the trial court erred, as a matter of law, in failing to consider whether defendant acted properly in setting aside the first two ALJs' decisions pursuant to Welfare and Institutions Code section 10959. She also asks this court to determine, as a matter of law, that Welfare and Institutions Code section 10959 is unconstitutional, in that it is vague and uncertain, does not contain adequate safeguards to prevent abuse of the power delegated by it to defendant, and thereby violates constitutional guaranties of due process of law. Defendant asserts plaintiff's contention has been waived by her failure to raise it below. (See *In re Cheryl E.* (1984) 161 Cal.App.3d 587, 603 [207 Cal.Rptr. 728].)

■ Plaintiff, in her petition for writ of mandate, claimed only that defendant's decision was invalid as unsupported by the evidence, and defendant's denial of Medi-Cal benefits for her was arbitrary and an abuse of discretion. In her motion for judgment on her petition for writ of mandate, she claimed "fundamental fairness demands that the first two [ALJs'] decisions be reinstated[.] . . . [¶] How many bites can [defendant] get out [of] the same apple? It appears that [defendant] would have held as many hearings as necessary to find an ALJ who would find [plaintiff] 'not disabled'." Plaintiff did not discuss Welfare and Institutions Code section 10959 or its constitutionality or cite any authority in support of her claim.

The record reveals plaintiff did not ask the trial court to determine whether defendant acted properly in setting aside the first two ALJs'

decisions pursuant to Welfare and Institutions Code section 10959. Therefore, the trial court did not err as a matter of law in failing to make that determination. (*In re Cheryl E., supra,* 161 Cal.App.3d at p. 603.) A trial court is not required to take actions or grant relief not embraced in the pleadings or requested by a motion. (*Ibid.*)

■■ ■■ As to the constitutionality of Welfare and Institutions Code section 10959 and the propriety of defendant's twice rejecting proposed decisions by ALJ's, plaintiff did not raise these issues below either. Ordinarily, this would waive her contention. (9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 316, pp. 327-328.) However, a new issue may be considered on appeal where the issue is one of law alone. (*Id.,* § 323, pp. 333-334.) Insofar as such an issue may be resolved as a matter of law, we may consider it and have chosen to do so.

■■ Welfare and Institutions Code section 10959 provides in pertinent part: "Within 30 days after the department has received a copy of the administrative law judge's proposed decision, the director may adopt the decision in its entirety; decide the matter himself or herself on the record, including the transcript, with or without taking additional evidence; or order a further hearing to be conducted by himself or herself, or another administrative law judge on behalf of the director."

Here, the first ALJ submitted a proposed decision to the department in which it was concluded plaintiff was disabled and the county erred in denying her Medi-Cal benefits. Pursuant to Welfare and Institutions Code section 10959, defendant ordered that a further hearing be held "to reevaluate [plaintiff's] medical condition and disability status in light of pertinent medical evidence to determine whether [she qualified for Medi-Cal] benefits." A hearing was held before a second ALJ, who submitted to the department a proposed decision in which it again was concluded plaintiff was disabled, from September 1985 through September 1986, and the county erred in denying her Medi-Cal benefits for that period. Pursuant to section 10959, defendant again ordered a further hearing "to receive additional medical evidence of [plaintiff's] condition." A hearing was held before a third ALJ, who concluded in his proposed decision plaintiff was not disabled. Defendant adopted this decision as his own pursuant to section 10959.

As plaintiff points out, Welfare and Institutions Code section 10959 places no limitation on the number of further hearings defendant may order after receiving ALJs' proposed decisions with which he disagrees. Neither does it set standards defining when a further hearing may be ordered. Plaintiff contends the statute is therefore void and violative of constitutional guaranties of due process, in that: "It is clearly vague and uncertain because it

allows department's [*sic* ] such as [defendant's] to effectively thwart the fair hearing process by 'fishing' for ALJs who will write decisions to deny benefits. Such conduct by [defendant] is arbitrary and capricious and the legislature failed to provide the requisite safeguards in the statute. The statute gives [defendant] unbridled, unguided and unlimited authority to hold further hearings for *any* reason which may or may not constitute a good cause. This statute confers upon the Department the ability to reject favorable decisions until it finds a judge to write an unfavorable decision. Clearly, if adequate or reasonable safeguards were present in [Welfare and Institutions Code section] 10959, such an outcome or misuse would not occur. [¶] The courts have uniformly held that '[d]elegated power must be accompanied by suitable [standards] to guide its use and to protect against its misuse.' [*Blumenthal* v. *Board of Medical Examiners* (1962) 57 Cal.2d 228, 236 [18 Cal.Rptr. 501, 368 P.2d 101].] Additionally, the absence of such standards or safeguards 'renders effective review of the exercise of the delegated power' impossible. [*Ibid.*]"

It is true the statute allows the director to search for an ALJ who would recommend denial of benefits. But it must be remembered the director is not bound by an ALJ's decision; he or she may reject an ALJ's decision favorable to a claimant and decide the matter himself or herself unfavorably. Thus, the absence in Welfare and Institutions Code section 10959 of standards governing how often and for what reasons further hearings may be ordered does not give the director any more power to render a decision against a claimant than he or she would have if such standards were in place.

Moreover, the director's actions are subject to review. A decision against the claimant is subject to judicial review by petition for writ of mandate (Welf. & Inst. Code, § 10962; Code Civ. Proc., § 1094.5), whereupon a court will reconsider the evidence and exercise its own independent judgment to determine whether the director's decision was the correct one (*Frink* v. *Prod*, *supra*, 31 Cal.3d at p. 180; *Harlow* v. *Carleson*, *supra*, 16 Cal.3d at p. 735).

If the director repeatedly orders further hearings and fails to render a decision within a reasonable time, it appears these actions would be subject to judicial review as well by petition for writ of mandate pursuant to Code of Civil Procedure section 1094.5. ■ Mandate is available to a claimant before defendant has rendered a decision where an administrative remedy is unavailable or inadequate. (See *Oliva* v. *Swoap* (1976) 59 Cal.App.3d 130, 134-136 [130 Cal.Rptr. 411]; *Diaz* v. *Quitoriano* (1969) 268 Cal.App.2d 807, 812 [74 Cal.Rptr. 358].)

■ Accordingly, we conclude plaintiff has not demonstrated Welfare and Institutions Code section 10959 is unconstitutional because it delegates

unlimited power to the director without any means for review of the exercise of that power. The director's exercise of delegated power is subject to judicial review, and the lack of restrictions on the number of further hearings which may be ordered or the reasons for ordering them does not confer on the director any additional power to reject an ALJ's decision.

## II

■ Plaintiff further contends an independent review shows the trial court erred prejudicially by basing its decision on the erroneous conclusion a claimant must be disabled for 12 consecutive months to be eligible for Medi-Cal benefits. Again, we disagree.

Eligibility for Medi-Cal benefits is governed by title 22 of the California Code of Regulations. Section 50201 of title 22, California Code of Regulations lists the programs under which a person may be eligible for Medi-Cal benefits; subdivision (a)(4) provides for benefits under the Medically Needy program. Section 50203, subdivision (a)(1) of title 22, California Code of Regulations, provides in pertinent part: "A person's eligibility shall be determined under the Medically Needy program if that person is any of the following: . . . [a] disabled person . . . ." Section 50223, subdivision (a)(1) of title 22, California Code of Regulations, provides adults are disabled if they are "Federally disabled persons . . . who meet the definition of disability in Title II or Title XVI, Social Security Act."

According to these titles of the Social Security Act, "The term 'disability' means . . . inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." (42 U.S.C. § 423(d)(1)(A); see 42 U.S.C. § 1382c(a)(3)(A); 20 C.F.R. §§ 404.1505(a), 416.905(a).) "An individual . . . shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." (42 U.S.C. § 423(d)(2)(A); see 42 U.S.C. § 1382c(a)(3)(B); 20 C.F.R. §§ 404.1505(a), 416.905(a).) Physical or mental impairment is that which "results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." (42 U.S.C. § 423(d)(3); see 42 U.S.C. § 1382c(a)(3)(C); 20 C.F.R. § 416.908.)

Plaintiff contends it is only the impairment, not the disability which must have lasted or been expected to last 12 months or more. She claims the

phrase "which has lasted or can be expected to last for a continuous period of not less than 12 months" applies to the "impairment," not the "inability to engage in any substantial gainful activity" (42 U.S.C. § 423(d)(1)(A)).

Two federal district courts have taken the same position. *White* v. *Finch* (D.Mass. 1970) 311 F.Supp. 307 stated, "Although the case law on the issue is inconclusive, the legislative history of the 1965 Amendments [to the Social Security Act] and the Secretary's regulations promulgated under them furnish support for plaintiff's position that the word 'which' relates to 'impairment.' Prior to 1965 disability was defined as: 'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or to be of long-continued and indefinite duration.' [Citations.] The 1965 Amendments broadened the disability protection by changing the time requirement to 12 months. In discussing the change, the Senate Finance Committee noted in its Report: 'The modification in the definition of disability recommended by the committee [12 months] does not change the requirement in existing law that an individual must by reason of his impairment be unable "to engage in any substantial gainful activity." ' [Citation.] It is submitted that this passage indicates that the 12-month time requirement refers to 'impairment' rather than 'inability.' " (At pp. 312-313.)

The court further noted, "The Conference Report, regarding the variances between the House and Senate versions of the Amendments, also supports the plaintiff's position. 'The bill as passed by the House struck out the requirement that the individual's *impairment* be one which can be expected to result in death or to be of long-continued and indefinite duration. The effect, in general, would be to take an *impairment* into account for disability freeze and disability insurance benefit purposes if the period of disability included 6 consecutive calendar months. [House version.] [ ]Under Senate amendment No. 312, the *impairment* must be one which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. [ ] The House recedes with a technical amendment.' [Italics added.] [Citation.]

"The regulations promulgated by the Secretary suggest that his interpretation also is that 'which' modifies 'impairment.' The regulation detailing the considerations to be employed in determining whether an impairment constitutes a disability contains the following: 'On the other hand, medical considerations alone . . . can . . . justify a finding that the individual is under a disability where his *impairment* is one that meets the duration requirement in § 404.1502 [12 months] . . . .' [Italics added.] 20 C.F.R. § 404.1502 (1969). Similarly, the Secretary's characterization of what constitutes an impairment indicates the same interpretation: 'The Listing of

Impairments [in the Appendix] describes, for each of the major body systems, impairments which—[¶] (1) Are of a level of severity deemed sufficient to preclude an individual from engaging in any gainful activity; and [¶] (2) Are expected to result in death or to last for a continuous period of not less than 12 months.' 20 C.F.R. § 404.1506 (1969). [¶] In conclusion, construction of the statutory language, the legislative history of the statute, the administrative regulations adopted under the statute, prior case law, and sound policy, all favor plaintiff's position." (311 F.Supp. at p. 313, italics in the original.)

*Gyurko* v. *Harris* (D.Conn. 1980) 487 F.Supp. 1121 reached a similar conclusion, albeit without analysis. The court stated: "Whether a claimant is under a 'disability' under the applicable statute does not depend . . . on the existence of an impairment which is so severe that it prevents the claimant from engaging in substantial gainful activity. It depends, rather, on a finding that (a) the claimant is unable 'to engage in any substantial gainful activity' (b) because of an impairment which is of such severity that it 'can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months.' [Citations.] The statutory test's reference to a continuous twelve month period relates to the period in which the claimant suffers from an impairment, rather than the length of time he is out of work." (At p. 1127.)

A contrary conclusion was reached by the court of appeals in *Alexander* v. *Richardson* (10th Cir. 1972) 451 F.2d 1185. The court pointed out that "[t]o recover disability benefits under the Act an applicant must be unable to engage in any substantial gainful activity. Disability is established by showing a medically determinable mental or physical impairment which prevents engaging in any gainful activity. Inability to engage in any gainful activity and the impairment which causes it cannot be separated. The two components of disability must exist at the same time. The statute, which defines disability, not impairment, speaks only of an impairment which can be expected to result in death or to last for a continuous period of at least twelve months and one which will disable a person seeking disability benefits for a like period. For example, an applicant may have an injury from which he has lost one of his hands. The result is a physical impairment for the remainder of his life, but if he is able to engage in any gainful activities within a year from his injury he is not entitled to benefits. We think the legislative history of this statute supports this interpretation." (At p. 1186.)

The *Alexander* court noted that "[p]rior to the 1965 amendment [of the Act], the statutory definition of disability provided that disability benefits were payable only in cases where the disability was expected to result in death or would be of a long continued and indefinite duration. In seeking to

eliminate this indefinite provision, the 1965 amendment proposed by the House of Representatives provided that such benefits would be payable to a claimant who had been totally disabled for at least six months, even though it was expected that he would recover in the foreseeable future. [Citation.] The Senate substituted a twelve-month duration requirement for the six-month requirement suggested by the House. In its report on the bill, the Senate Finance Committee stated: 'The House bill would broaden the disability protection afforded by the social security program by providing disability insurance benefits for an insured worker who has been totally disabled throughout a continuous period of 6 calendar months. The committee believes that the House provision could result in the payment of disability benefits in cases of short-term, temporary disability . . . . The committee believes, therefore, that it is necessary to require that a worker be under a disability for a somewhat longer period than 6 months in order to qualify for disability benefits. As a result, the committee's bill modifies the House bill to provide for the payment of disability benefits for an insured worker *who has been or can be expected to be totally disabled throughout a continuous period of 12 calendar months.* (Italics supplied) . . . The modification in the definition of disability recommended by the committee does not change the requirement in existing law that an individual must by reason of his impairment be unable "to engage in any substantial gainful activity." ' [Citation.] The Senate version became law." (*Alexander* v. *Richardson, supra,* 451 F.2d at pp. 1186-1187, italics in the original.)

The court noted the *White* v. *Finch* case but pointed out "other cases have indicated or assumed that the Act was designed to allow benefits only where the insured's inability to engage in any substantial gainful activity extends for the minimum twelve-month period." (*Alexander* v. *Richardson, supra,* 451 F.2d at p. 1187.) It also determined to give effect to the Secretary's interpretation of the statutory definition of disability if reasonable. (*Ibid.*) The court thus concluded both inability to engage in substantial gainful employment and impairment must last or be expected to last for at least 12 months to entitle a claimant to disability benefits.

*Alexander* was followed and *White* rejected in *Sierakowski* v. *Weinberger* (6th Cir. 1974) 504 F.2d 831, 833 and footnote 1 and *Kendrick* v. *Califano* (E.D.Va. 1978) 460 F.Supp. 561, 568, footnote 9. *Alexander* also was followed in *Pate* v. *Heckler* (5th Cir. 1985) 777 F.2d 1022, 1026 and *Markham* v. *Califano* (10th Cir. 1979) 601 F.2d 533, 534. Other cases, while not discussing *Alexander*, have indicated the 12-month durational requirement applies to the disability, not merely the impairment. (*Krumpelman* v. *Heckler* (9th Cir. 1985) 767 F.2d 586, 589; *Martell* v. *Heckler* (E.D.Pa. 1983) 568 F.Supp. 729, 731.) Neither *White* nor *Gyurko* v. *Harris* has been

followed for the proposition the durational requirement applies to the impairment only.

Of the two positions, we believe the better reasoned to be that espoused in *Alexander*: that the impairment must be severe enough to cause an inability to engage in substantial gainful employment, and it must have lasted or be expected to last with that severity for at least 12 months; in other words, that both disability and impairment must last or be expected to last for 12 months. Although "which" in the pertinent sections does appear to modify "impairment," the section can be read to require that the impairment concurrently cause inability to engage in substantial gainful employment and last or be expected to last for at least 12 months.

This conclusion is buttressed by a number of sections in title 20 of the Code of Federal Regulations. Section 404.1505(a) of title 20, Code of Federal Regulations defines "disability," then states: "To meet this definition, you must have a severe impairment, which makes you unable to do your previous work or any other substantial gainful activity . . . ." Section 404.1511 of title 20, Code of Federal Regulations defines what a "disabling impairment" is, pointing to a list of impairments. Section 404.1520 of title 20, Code of Federal Regulations, which describes the steps for evaluating disability, states: "Your impairment[ ] must be severe *and* meet the duration requirement . . . ." (Subd. (a), italics added.) Section 404.1522 of title 20, Code of Federal Regulations deals with unrelated impairments; it provides: "We cannot combine two or more unrelated severe impairments to meet the 12-month duration test. If you have a severe impairment(s) and then develop another unrelated severe impairment(s) but neither one is expected to last for 12 months, we cannot find you disabled, even though the two impairments in combination last for 12 months. . . . If you have two or more concurrent impairments which, when considered in combination, are severe, we must also determine whether the combined effect of your impairments can be expected to continue to be severe for 12 months." The thrust of these sections is that the impairment must be severe, causing the inability to do any substantial gainful activity, for 12 months. In short, the disability as well as the impairment must last 12 months.

Furthermore, it appears as though the congressional intent, as discussed in *Alexander*, was to preclude disability benefits for short-term disability but provide such benefits only where the disability itself lasted or could be expected to last 12 months or more. (*Alexander v. Richardson, supra,* 451 F.2d at pp. 1186-1187.) Senate Report No. 404 on the 1965 amendments to the Social Security Act, quoted in *Alexander,* also stated, in its overview of the bill, "The bill would eliminate the present requirement that a worker's *disability* must be expected to be of long continued and indefinite duration,

and instead provide that an insured worker would be eligible for disability benefits if he has been under a *disability* which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 calendar months." (1965 U.S. Code Cong. & Admin. News, at p. 1955, italics added.) Even Conference Report No. 682, from the House of Representatives, quoted in *White*, does not clearly distinguish between an impairment and the disability it causes. While it speaks of an "impairment . . . which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months," it describes the House version of the bill as having the general effect of taking "an impairment into account for a disability freeze and disability insurance benefit purposes if the *period of disability* included 6 consecutive calendar months." (*Id.* at p. 2249, italics added.)

Accordingly, we hold it is the disability—both impairment and inability to engage in any substantial gainful activity—which must last or be expected to last 12 months or more, not merely the impairment. The impairment must continue to be severe and disabling for the entire time period, not merely existent. ▇▇ ▬▬ (Accord, *Anthony* v. *Kizer* (1991) 230 Cal.App.3d 990, 998 [281 Cal.Rptr. 516], rehg. den. June 11, 1991.)[4]

### III, IV*

. . . . . . . . . . . . . . . . . . . . . . . . . . . .

The order is affirmed.

Devich, J., and Ortega, J., concurred.

Appellant's petition for review by the Supreme Court was denied September 5, 1991. Mosk, J., was of the opinion that the petition should be granted.

---

[4]At oral argument, plaintiff's counsel asserted for the first time that plaintiff should have been determined to be disabled, in that her impairment was "likely" to result in death. This assertion, not having been raised in plaintiff's opening brief, is waived. (*Balboa Ins. Co.* v. *Aguirre* (1983) 149 Cal.App.3d 1002, 1010 [197 Cal.Rptr. 250].) In any event, the Social Security Act's definition of disability requires that the impairment be *expected* to result in death. (42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).) There was no evidence plaintiff's lupus was expected to result in death, only that death was a possible result of her low platelet count and immune thrombocytopenic purpura if she were not careful. Clearly then, her entitlement to Medi-Cal benefits due to disability, if any, must be based on a disabling impairment which lasted or was expected to last at least 12 months. (*Ibid.*)

*See footnote *ante*, page 1348.