[No. A053670. First Dist., Div. Five. July 23, 1992.]

BARBARA RUTH et al., Plaintiffs and Respondents, v.
KENNETH KIZER, as Director, etc., Defendant and Appellant.

382

## Counsel

Daniel E. Lungren, Attorney General, Charlton Holland, Assistant Attorney General, Stephanie Wald and John C. Porter, Deputy Attorneys General, for Defendant and Appellant.

Evelyn R. Frank, Stephen E. Ronfeldt, Tanya Broder and John Welch for Plaintiffs and Respondents.

## Opinion

**HANING, J.**—Appellant Kenneth Kizer, Director of the California Department of Health Services (DHS), appeals a writ of mandate issued pursuant to Code of Civil Procedure section 1094.5 requiring him to authorize oxygen and portable oxygen equipment for Medi-Cal recipients Barbara Ruth, June

P. Hall, Cricket J. Buffalo and Susan Molloy (collectively, respondents). At issue is whether appellant's refusal to pay for oxygen and portable oxygen equipment for treatment of "Multiple Chemical Sensitivities" (MCS) violated federal and state law.

## FACTS AND PROCEDURAL HISTORY

All respondents are persons entitled to receive benefits through Medi-Cal, a state medical assistance program affording qualified individuals health care and related remedial or preventative services. (Welf. & Inst. Code, § 14000.)[1] They have each been diagnosed by their treating physicians as having a severe hypersensitivity to chemical substances commonly found in the environment, such as perfume, cigarette smoke, chemical fumes, cleaning fumes, and car fumes. Their physicians refer to it as "Multiple Chemical Sensitivities" or "Environmentally-Induced Illness." In the medical literature the condition is not defined by any single diagnostic nomenclature, but has been described variously as "ecological illness, food and chemical sensitivity, chemical hypersensitivity syndrome, Twentieth Century Disease, or total allergy syndrome."[2] Symptoms include impaired cognitive functions, speech impairments, migraine headaches, nausea, vomiting, debilitating fatigue, dizziness and shortness of breath. Respondents' treating physicians believe that oxygen therapy alleviates these symptoms and that in the absence of oxygen treatment, the symptoms recur.

Generally, Medi-Cal requires that a DHS consultant authorize payment of a medical service before a physician can render the service to a Medi-Cal patient. (§ 14133; Cal. Code Regs., tit. 22, § 51003, subd. (a).) A physician obtains authorization by submitting a treatment authorization request (TAR) to a Medi-Cal field office. Respondents' treating physicians submitted TAR's for oxygen and portable oxygen equipment. Appellant deferred approval, requesting the treating physicians to supply information set forth in an internal DHS policy memorandum governing home oxygen therapy. Respondents were also required to submit a consultation report from an allergist certified by the American Board of Allergy and Immunology.

The policy memorandum states that prior authorization requires the following documentation: "1. A diagnosis of the disease requiring home use of oxygen. [¶] 2. Laboratory evidence of significant hypoxemia in the chronic stable state. [¶] 3. The flow rate and oxygen concentration prescribed. [¶] 4. An estimate of the frequency and duration of use. [¶] 5. Evidence that other treatment has been tried without success or is inappropriate." The memorandum identifies the diagnoses permitting home oxygen therapy as severe lung

---

[1] Unless otherwise indicated, all further statutory references are to the Welfare and Institutions Code.

[2] For convenience we shall refer to respondents' condition as MCS.

disease or "[h]ypoxia-related symptoms or findings that might be expected to improve with oxygen therapy, such as: [¶] . . . [¶] Impairment of the cognitive process. [¶] . . . [¶] Morning headache." The memorandum requires evidence of decreased arterial blood oxygen saturation to satisfy the documentation requirement of laboratory evidence of significant hypoxemia.

Respondents' physicians submitted no laboratory evidence of significant hypoxemia, as required by the memorandum, nor did respondents Molloy, Buffalo or Ruth submit consultation reports from an allergist. The physician for Molloy and Buffalo replied that they did not have pulmonary diseases, and that their blood gases would be in the normal range, so that any tests for low blood oxygen "would be . . . a waste of time and money . . . ." Hall's physician replied that arterial blood gas tests were not applicable to her situation. The allergist who examined Hall was of the opinion that Hall's problems were allergic in nature, specifically to trees, grasses and dust, and recommended methods of reducing exposure to household dust, including an air filter. He did not mention oxygen treatment as possible therapy. Nevertheless, respondents' treating physicians urged approval of oxygen therapy for their symptoms, disagreeing with the criteria specified in the policy memorandum.

Because the requested documentation was not submitted, appellant did not authorize home oxygen therapy for respondents. When Medi-Cal denies a service, Medi-Cal recipients are entitled to a "fair hearing" before a state hearing officer. (§ 10950; Cal. Code Regs., tit. 22, § 51014.1.) Respondents so availed themselves, and separate hearings were held for each. The administrative law judges (ALJs) issued nearly identical decisions upholding the denial of coverage. They found that the requisite justification for use of oxygen therapy under the policy memorandum had not been submitted, the reliability of a chemical hypersensitivity diagnosis had not been established, and no "authoritative evidence" was submitted indicating that oxygen is a recognized and effective treatment for respondents' condition. The ALJs concluded that oxygen therapy must be considered experimental, and thus not covered by Medi-Cal. Following the established review procedures (§§ 10958-10961; Cal. Code Regs., tit. 22, § 50953), appellant adopted the decisions of the ALJs.

Respondents petitioned for writ of mandate to reverse appellant's decision. In its statement of decision granting their petition, the trial court ruled that appellant had "not proceeded in the manner required by law" and that his decisions were not supported by the evidence produced at the administrative hearings. The court determined that: (1) Oxygen and oxygen therapy equipment are recognized Medi-Cal benefits; (2) DHS authorizes oxygen "to treat symptoms or findings that might be expected to improve with oxygen

therapy, including impairment of the cognitive process"; (3) DHS authorizes portable oxygen systems for individuals who need such equipment to allow them to leave home on necessary business or to conduct a normal lifestyle; (4) because the Legislature and DHS have decided that "oxygen is a medically necessary service," treating physicians are responsible for the decision as to whether oxygen is the appropriate treatment for respondents' symptoms; (5) appellant's evidence does not support his decision to override respondents' treating physicians' judgment; and (6) appellant's decision to deny oxygen and related equipment to respondents in the face of evidence showing that oxygen is effective to alleviate their severe and disabling symptoms conflicts with applicable law.

## STANDARD OF REVIEW

█ Judicial review of the denial of Medi-Cal benefits exists through the administrative mandate process pursuant to Code of Civil Procedure section 1094.5. (§ 10962; Cal. Code Regs., tit. 22, § 50951; *Cooper* v. *Kizer* (1991) 230 Cal.App.3d 1291, 1295-1296 [281 Cal.Rptr. 421].) In reviewing decisions denying applications for public assistance such as Medi-Cal benefits, the superior court exercises its independent judgment, i.e., it reconsiders the evidence presented at the administrative hearing and makes its own independent findings of fact. (*Frink* v. *Prod* (1982) 31 Cal.3d 166, 173-174 [181 Cal.Rptr. 893, 643 P.2d 476]; *Harlow* v. *Carleson* (1976) 16 Cal.3d 731, 735 [129 Cal.Rptr. 298, 548 P.2d 698]; *Chatterjee* v. *Kizer* (1991) 231 Cal.App.3d 1348, 1357 [283 Cal.Rptr. 60]; *Cooper* v. *Kizer, supra,* at p. 1296; *Anthony* v. *Kizer* (1991) 230 Cal.App.3d 990, 993 [281 Cal.Rptr. 516].) █ Appellate review of the trial court's factual findings is governed by the substantial evidence test, and issues of law are reviewed de novo.

## DISCUSSION

Appellant advances many contentions on appeal, the primary one being that MCS does not exist as a recognized medical diagnosis. We need not address this contention because we agree with appellant that respondents have failed to demonstrate under applicable state regulations that they were entitled to their requested treatment.

Title XIX of the Social Security Act (42 U.S.C. §§ 1396-1396s), commonly known as the Medicaid Act (the Act), is a cooperative federal-state program designed to provide medical assistance to persons such as respondents, whose income and resources are insufficient to meet the costs of medical care. The Act requires that participating states have a medical assistance plan providing qualified individuals with services in at least seven general categories: (1) Inpatient hospital services; (2) outpatient hospital

services; (3) laboratory and X-ray services; (4) skilled nursing facility services; (5) physician services; (6) nurse-midwife services authorized under state law; and (7) certified pediatric or family nurse practitioner services authorized under state law. (42 U.S.C. §§ 1396a(a)(10), 1396d(a)(1)-(5), (a)(17), (a)(21).) Although the Act does not require states to provide funding for all medical treatment falling within the seven general categories, it requires the states' plans to include reasonable standards for determining the extent of medical assistance thereunder which are consistent with the Act's objectives. (42 U.S.C. § 1396a(a)(17); *Beal* v. *Doe* (1977) 432 U.S. 438, 441 [53 L.Ed.2d 464, 469, 97 S.Ct. 2366].)

■ States have considerable discretion in designing their Medicaid programs, and "appropriate limits [may be placed] on a service based on such criteria as medical necessity or utilization control procedures." (42 C.F.R. § 440.230(d).) "[A] state may establish standards for individual physicians to use in determining what services are appropriate in a particular case." (*Rush* v. *Parham* (5th Cir. 1980) 625 F.2d 1150, 1156.) However, states "may not arbitrarily deny or reduce the amount, duration, or scope of a required service . . . to an otherwise eligible recipient solely because of the diagnosis, type of illness, or condition." (42 C.F.R. § 440.230(c).) "A state may place a generic limit on Medicaid services based upon a judgment as to the degree of medical necessity of those services, so long as it does not discriminate on the basis of the specific medical condition which occasions the need." (*Cowan* v. *Myers* (1986) 187 Cal.App.3d 968, 980 [232 Cal.Rptr. 299]; see also, *Jackson* v. *Stockdale* (1989) 215 Cal.App.3d 1503, 1511 [264 Cal.Rptr. 525].) A state's definition of medically necessary services can reasonably exclude experimental treatment. (*Rush* v. *Parham, supra,* p. 1156.) Although physicians still have the primary responsibility for determining what treatment should be available to their patients, they must operate within the reasonable limitations that the state may impose. (*Ibid.*; see also, *Jackson* v. *Stockdale, supra,* at p. 1511; *Cowan* v. *Myers, supra,* at p. 978.)

California's Medicaid program, Medi-Cal, is set forth in section 14000 et seq. Section 14005 provides that "[t]he health care benefits and services specified in this chapter . . . shall be provided [to any eligible state resident]." Section 14059.5 provides: "A service is 'medically necessary' or a 'medical necessity' when it is reasonable and necessary to protect life, to prevent significant illness or significant disability, or to alleviate severe pain."

Section 14132, which contains the Medi-Cal schedule of benefits, provides in subdivision (m) that durable medical equipment is a covered benefit, subject to utilization control. California Code of Regulations, title 22, section 51521, subdivision (i)(8) lists oxygen therapy equipment as reimbursable, durable medical equipment.

California has excluded "experimental services" from Medi-Cal coverage. (Cal. Code Regs., tit. 22, § 51303, subd. (g).) "Experimental services" are defined as "those drugs, equipment, procedures or services that are in a testing phase undergoing laboratory and/or animal studies prior to testing in humans." (Cal. Code Regs., tit. 22, § 51056.1, subd. (a).)

"Investigational services" are subject to a qualified exclusion from coverage. (Cal. Code Regs., tit. 22, §§ 51303, subd. (h).) "Investigational services" are defined as "those drugs, equipment, procedures or services for which laboratory and animal studies have been completed and for which human studies are in progress but: [¶] (1) Testing is not complete; and [¶] (2) The efficacy and safety of such services in human subjects are not yet established; and [¶] (3) The service is not in wide usage." (Cal. Code Regs., tit. 22, § 51056.1, subd. (b).)

California Code of Regulations, title 22, section 51303, subdivision (h) states: "Investigational services are not covered except when it is clearly documented that *all* of the following apply: [¶] (1) Conventional therapy will not adequately treat the intended patient's condition; [¶] (2) Conventional therapy will not prevent progressive disability or premature death; [¶] (3) The provider of the proposed service has a record of safety and success with it equivalent or superior to that of other providers of the investigational service; [¶] (4) The investigational service is the lowest cost item or service that meets the patient's medical needs and is less costly than all conventional alternatives; [¶] (5) The service is not being performed as part of a research study protocol; [¶] (6) There is a reasonable expectation that the investigational service will significantly prolong the intended patient's life or will maintain or restore a range of physical and social function suited to activities of daily living. [¶] All investigational services require prior authorization. Payment will not be authorized for investigational services that do not meet the above criteria . . . ." (Italics added.)

California Code of Regulations, title 22, section 51056.1, subdivision (c) states: "The determination that a service is experimental or investigational is based on: [¶] (1) Reference to relevant federal regulations, such as those contained in Title 42, Code of Federal Regulations, Chapter IV (Heatlh Care Financing Administration) and Title 21, Code of Federal Regulations, Chapter I (Food and Drug Administration); [¶] (2) Consultation with provider organizations, academic and professional specialists pertinent to the specific service; [¶] (3) Reference to current medical literature."

At issue in this case is whether oxygen and portable oxygen equipment for treatment of MCS fall within the regulatory categories of experimental or investigational services. ■ "The interpretation of a regulation, like the interpretation of a statute, is, of course, a question of law . . . , and while an

administrative agency's interpretation of its own regulation obviously deserves great weight . . . the ultimate resolution of such legal questions rests with the courts." (*Carmona* v. *Division of Industrial Safety* (1975) 13 Cal.3d 303, 310 [118 Cal.Rptr. 473, 530 P.2d 161], citations omitted.) As with statutory language, if the words of a regulation are clear, the court should not add to or alter them to accomplish a purpose that does not appear on the face of the regulation. (*California Teachers Assn.* v. *San Diego Community College Dist.* (1981) 28 Cal.3d 692, 698 [170 Cal.Rptr. 817, 621 P.2d 856]; *Carmona* v. *Division of Industrial Safety, supra,* at p. 313.)

■ On its face, California Code of Regulations, title 22, section 51056.1, defining experimental and investigative services, applies only to "drugs, equipment, procedures or services." It does not apply to diagnoses. It provides a generic exclusion for experimental services. Since oxygen and oxygen equipment are referred to in California Code of Regulations, title 22, sections 51321 and 51521 as durable medical *equipment,* they may be considered experimental or investigational if they meet the regulatory requirements. Thus, in those cases where use of oxygen and oxygen therapy equipment is experimental, it is subject to an absolute exclusion from coverage. Where such oxygen use is investigational, it is subject to qualified exclusion. Neither party challenges the regulations regarding experimental and investigational services, nor do they contend that the state plan conflicts with federal regulations.

We reiterate that "experimental services" are defined as services still in a laboratory testing phase prior to testing in humans. (Cal. Code Regs., tit. 22, § 51056.1, subd. (a).) At the administrative hearing the parties submitted voluminous medical literature discussing a condition described in a myriad of ways, including "ecological illness, food and chemical sensitivity, chemical hypersensitivity syndrome, Twentieth Century disease, . . . total allergy syndrome" and "multiple chemical sensitivities."[3] Although the literature revealed a significant controversy within the medical community as to

---

[3]Among the literature submitted was:

1. A transmittal from the policy office of the Social Security Administration on evaluation guidelines for environmental illness which refers to "Clinical ecology" or "environmental medicine" as "an approach to medicine that ascribes a wide range of symptoms to exposure to numerous common substances in the environment. . . . [¶] In claims alleging disability due to environmental illness, it is often difficult to identify abnormal signs and laboratory findings which can be associated with the alleged symptoms. Therefore, in evaluating claims based on environmental illness, all of the claimant's symptoms, signs, and laboratory findings must be considered to determine if there is a medically determinable impairment . . . . This evaluation should be made on an individual case-by-case basis . . . ."

2. From the October-December 1987 issue of Occupational Medicine two articles entitled "The Epidemiology of Multiple Chemical Sensitivities (MCS)" by the program administrator of the Yale-New Haven occupational medicine program and "The Worker with Multiple Chemical Sensitivities: an Overview" by an associate professor of medicine and epidemiolgoy

how to accurately characterize and diagnose the condition, its potential causes and its appropriate treatment, it also revealed that oxygen therapy has occasionally been used as treatment in humans for the condition. Because it is undisputed that oxygen therapy has progressed beyond the laboratory/animal testing stage and has been tested on humans suffering symptoms allegedly caused by MCS, it is not, by California Code of Regulations definition, experimental.

The literature also demonstrates that oxygen therapy, albeit controversial as a treatment for MCS, is an "investigational service," as the Code of Regulations defines the term: It is currently being used, by a limited number

---

at Yale University School of Medicine and director of the Yale-New Haven occupational medicine program. The former noted that despite "the virtual absence of epidemiological data, it has become increasingly evident to many occupational medicine clinicians around the country that there exists a not insignificant minority of patients with MCS[,]" and stated that the primary controversy in the field of environmental sensitivity is whether MCS has a physiological basis(es) and, if so, what triggers it. The latter noted that practitioners of occupational medicine were increasingly reporting "recurrent and toxicologically inexplicable symptomatic reactions to quite low levels of common airborne substances," that recognition of the syndrome did not lead readily to improved understanding or enhanced therapeutic efficacy, that considerable theoretical work in the area had been generated by a movement known as clinical ecology, and that medicine has "not come a long way towards the goal of understanding the problem . . . ."

3. A 1986 report by the California Medical Association's task force on clinical ecology entitled *Clinical Ecology—A Critical Appraisal*. The task force recognized that certain environmental chemicals and allergens produce well-defined syndromes in humans and some people suffer from illnesses that are not readily diagnosed and for which only supportive therapy exists. It concluded that clinical ecology does not constitute a valid medical discipline, and that scientific and clinical evidence to support a diagnosis of environmental illness is lacking. It noted that there is a paucity of published studies to prove or disprove clinical ecology hypotheses and most studies have such serious methodological flaws that their conclusions are unacceptable, and that in the few existing scientifically valid studies, the effectiveness of certain treatment was based principally on a placebo response. The task force recognized that while all or some of clinical ecologists' hypotheses and treatments may be valid, they should be subjected to modern, scientific methods of evaluation.

4. A 1989 position paper by the American College of Physicians entitled *Clinical Ecology*. Its conclusions were similar to those of the CMA task force. It noted that clinical ecologists use a treatment program that includes avoidance of environmental chemicals, rotation of foods in the diet, and neutralization of symptoms with injected or sublingual extracts. For the most part, drug therapy is intentionally avoided, although some clinical ecologists recommend mineral salts, *oxygen*, vitamins, minerals, and antioxidants for symptom relief. It concluded that the existence of environmental illness as presented in clinical ecology theory must be questioned because of the lack of a clinical definition and diagnoses and treatments involve procedures of no proven efficacy. It concluded that the potential adverse effects from clinical ecologists' treatment procedures has not been evaluated. Concern has also been expressed that serious ethical problems may exist due to the use of treatments before they have been proved safe and effective.

of practitioners, to treat patients with MCS; further patient testing is required; the efficacy and safety of such treatment has not yet been conclusively proven; and the treatment is not widely used outside the small sphere of physicians practicing "clinical ecology" or "environmental medicine."

However, even though a medical treatment may, in the abstract, meet the definition of "investigational service," a Medi-Cal patient must satisfy all six criteria of California Code of Regulations, title 22, section 51303, subdivision (h) in order to qualify for an investigative service. (See p. 387, *ante.*) Evidence by respondents' treating physicians sufficiently documents two of the criteria: Conventional therapy was inadequate to treat respondents' symptoms, and portable oxygen and oxygen equipment, by permitting respondents to leave their homes, would "restore a range of physical and social function suited to activities of daily living." (Cal. Code Regs., tit. 22, § 51303, subd. (h)(1) and (6).) Respondents presented no evidence documenting the applicability of the other four criteria. In the absence of the requisite documentation, appellant could properly deny respondents' requests for oxygen and oxygen equipment. The fact that appellant's reason for denying the request—oxygen treatment for MCS is experimental—was incorrect is not sufficient grounds for disturbing his ruling, since the ultimate ruling is correct for other valid reasons. (*D'Amico* v. *Board of Medical Examiners* (1974) 11 Cal.3d 1, 18-19 [112 Cal.Rptr. 786, 520 P.2d 10]; 9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 259, p. 266.)

The record demonstrates that the recommended treatment is presently still in the investigative stage, at best. Investigative services are covered only upon specific and complete documentation, which is lacking here. Consequently, appellant had no obligation to provide such service based on the TAR's submitted.

The judgment is reversed and the matter remanded with instructions to remand to appellant for further hearing on respondents' entitlement to oxygen therapy as an investigative service. Each party to bear their own costs.

King, Acting P. J., and Chesney, J.,* concurred.

A petition for a rehearing was denied August 13, 1992.

---

*Judge of the San Francisco Superior Court sitting under assignment by the Chairperson of the Judicial Council.