Filed 12/22/23  Lattimore v. Department of Social Services CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| YVONNE LATTIMORE,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>DEPARTMENT OF SOCIAL SERVICES,<br><br>Defendant and Respondent. | H050171<br>(Monterey County<br>Super. Ct. No. 20CV003429) |

Yvonne Lattimore, representing herself, appeals from a trial court order denying her petition for writ of mandate for paramedical and range of motion services. Lattimore sought services through the In-Home Supportive Services (IHSS) program, overseen by the California Department of Social Services and administered here by Monterey County (the County). Lattimore requested a variety of services, including feeding and meal preparation, hygiene and grooming, dressing, massage, transportation, medicine administration, and electrical nerve stimulation, for ailments involving her hands, elbows, shoulders, neck, back, hip, groin, knees, ankles, and feet.

We understand Lattimore to contend on appeal that the trial court abused its discretion and committed error in making evidentiary rulings and in concluding that she failed to point to sufficient evidence in the record to support her claims. Lattimore

further asserts the trial court showed bias against her. Lattimore requests that this court direct the trial court to set aside its order denying her petition and to grant her service hours.

For the reasons explained below, we reject Lattimore's contentions and affirm the trial court's order.

## I. FACTS AND PROCEDURAL BACKGROUND[1]

Lattimore has received IHSS services since April 16, 2010. The record indicates that Lattimore challenges the denial of services during two periods (collectively, the Subject Timeframes): December 18, 2017, to November 6, 2018 (first Subject Timeframe), and April 10, 2019, to July 17, 2019 (second Subject Timeframe).

In December 2019, an administrative law judge (ALJ) issued a decision regarding (1) the rehearing of an October 2018 ALJ decision covering the first Subject Timeframe, and (2) the hearing regarding Lattimore's April 10, 2019 request for IHSS service hours, covering the second Subject Timeframe (collectively, December 2019 ALJ decision). Lattimore petitioned the trial court for review of the December 2019 ALJ decision. The trial court denied the petition, and we review that denial in this appeal.

To provide context to Lattimore's arguments in this appeal, we set out many (but not all) of Lattimore's requests for IHSS services from the County, the evidence she submitted, the County's assessments and responses, and decisions rendered by ALJ's on Lattimore's challenges to the County's denial of requested services.

---

[1] "We recite the essential relevant facts 'in the manner most favorable to the judgment, resolving all conflicts and drawing all inferences in favor of respondent.' " (*Nwosu v. Uba* (2004) 122 Cal.App.4th 1229, 1233, fn. 2 (*Nwosu*).) We describe conflicting evidence only as relevant to Lattimore's contention that there is sufficient evidence demonstrating her need for range of motion and paramedical services for the Subject Timeframes.

A.  *Events Prior to December 18, 2017*

In 2016, Lattimore reported to the County that she was receiving daily physical therapy from Marina Physical Therapy (Marina PT).  She submitted to the County an unsigned letter from Marina PT, dated October 14, 2016, that stated Lattimore had been going to Marina PT five days per week for the past year for physical therapy on her knee, hip, neck, back, foot, shoulder, and hands.  Lattimore asserted that the letter was unsigned because "it was going to a third party."  She also stated that Marina PT could not provide her a list of the times she had used their services "because they had a computer malfunction and lost all their files prior to September 2016."  When the County called Marina PT to verify this information, Marina PT stated that no patient used their services five times per week.  Further, Marina PT asserted it had not experienced a computer malfunction, and Lattimore could have obtained a record of her use of Marina PT services.

On April 6, 2017, County employees observed Lattimore at a Walmart store. Lattimore was pushing a loaded shopping cart without assistance.  When Lattimore saw the County employee, she left the store.  Two other County employees were also in the store and viewed Lattimore walking without assistance or any signs of distress.  Two of the employees saw Lattimore drive away from the store in a silver car.

On June 5, 2017, Lattimore went to Natividad Medical Center (NMC) for pain in her feet.  She was diagnosed by Dr. A.S.[2] as having "Achilles insertion, also calcific tendinitis bilateral"; "[m]idsubstance Achilles tendinitis/tendinosis bilateral"; "[p]lantar fasciitis, bilateral"; "[h]ammer digit fifth bilateral with chronic clavus"; and an "[i]rregularly-shaped pigmented lesion, 6 mm, left fifth toe."  Dr. A.S. prescribed physical therapy, instructed Lattimore to "wear the proper shoes" and possibly arch

---

[2] We refer to Lattimore's doctors by their initials to protect their privacy interests. (See Cal. Rules of Court, rule 8.90(b)(10).)

supports, and suggested an operation to repair her fifth toe once she received medical clearance from Dr. H. for the surgery.

On December 1, 2017, Lattimore had a surgical procedure at NMC during which Dr. J.S. released the "[l]eft first extensor compartment" of Lattimore's left wrist, and placed a "thumb spica splint" on her left hand, to treat de Quervain syndrome (December 2017 surgery).

B. *Events Precipitating Decisions on Services in First Subject Timeframe: December 18, 2017, to November 6, 2018*

On December 18, 2017, two County employees made a home visit to perform an annual reassessment of Lattimore's condition and needs (2017 reassessment). At that time, Lattimore was receiving 283 service hours per month, the maximum allowable IHSS service hours.

The County employees observed that, although Lattimore claimed she could not grip with her hands or feed herself, she was able to pinch and adjust her glasses. When asked if she could drive, Lattimore responded " 'I do not drive' " but then, despite wearing a brace on her left hand, "closed her hands tightly" as if using a steering wheel, "and stated that she could not do that." Lattimore also told the County employees that she could "brush her teeth, write and lift some objects that are not too heavy." Although Lattimore "reported Achilles insertion, calc[if]ic tend[in]itis bilateral mid substance, Achilles tendinitis/tendinosis bilateral, plantar fasciitis, and bilateral hammer digit chronic clavus," the County employees saw that Lattimore "was able to get up and down from the recliner and walk around the apartment with no difficulty." The County employees also stated that Lattimore was able to reach diagonally across her body and reach for objects without apparent discomfort.

Based on these observations, the County issued a Notice of Action (NOA) dated December 22, 2017, decreasing Lattimore's IHSS service hours to 71 hours and 45 minutes per month. The County issued a further NOA dated December 26, 2017,

4

reducing Lattimore's IHSS service hours by another 34 hours and 38 minutes per month, to 37 hours and seven minutes per month.  The County explained in the December 26, 2017 NOA that it would not grant Lattimore any hours for either range of motion or paramedical services until she signed a medical records release allowing the County to speak directly with her doctors.  The County had concerns regarding the authenticity of the forms they received from Lattimore "based on the advice of [a] state fraud investigator . . . and Monterey [County] Quality Assurance Supervisor."  Lattimore subsequently requested a hearing to contest the County's reduction of her IHSS service hours.

Lattimore submitted to the County a paramedical services request form dated December 27, 2017, allegedly completed and signed by Dr. L.F., which requests daily paramedical services to "[t]reat scalp, shampoo, condition, blow dry, [and] apply medication" to address Lattimore's "[f]olliculitis" for Lattimore's lifetime (December 2017 paramedical services request form).

Lattimore submitted to the County seven range of motion request forms dated December 29, 2017, allegedly completed and signed by Dr. J.S. (December 2017 range of motion services request forms).  These forms requested the following as range of motion services either indefinitely or for Lattimore's lifetime: feeding due to Lattimore's "tendonitis"; AirCast ice machine treatment for both hands and feet, right knee, and right elbow to treat "tendonitis, carpal tunnel, DeQuervains Tenosynovitis, plantar fascitis [*sic*], Achilles tendonitis, menscus [*sic*] tear, [and] congenital fusion"; electro-orthostim (also known as transcutaneous electrical nerve stimulation [TENS]) to treat "left and right shoulder rotator cuff disease"; paraffin hot wax, wrap, heat, hand massage, medication application, and electro-orthostim to treat "left and right carpal tunnel and DeQuervain's Tenosynovitis"; electro-orthostim of both hands, right hip/groin, and right knee to treat "carpal tunnel syndrome, bursa bursitis, strain and IT band, meniscus tear, [and] DeQuervain's"; ice, massage, electro-orthostim, stretching exercise, medication

5

application, and heat to treat Achilles issues in both feet, bilateral tendonitis, and "plantar fasciitis bilateral"; and electro-orthostim to treat "lumbar strain, cervical disc disease, and shoulder impingement bilateral." (Some capitalization omitted.)

Lattimore provided the County with a declaration, purportedly signed by Dr. J.S., dated March 16, 2018. The declaration stated that Dr. J.S. had personally completed and signed the IHSS forms, but he did not believe he was required to provide further verification and was not willing to speak with any County personnel regarding Lattimore's medical condition.

In a decision adopted on April 12, 2018, pursuant to the February 2018 hearing (April 2018 ALJ decision), the ALJ ordered the County to authorize IHSS service hours for Lattimore in a variety of service categories, but remanded the claim for range of motion and paramedical services back to the County for authorization and verification from Lattimore's medical provider.

In response to this order, the County authorized 90 hours and 48 minutes of IHSS per month (April 2018 NOA). The April 2018 NOA did not authorize the range of motion and paramedical services Lattimore requested. The County explained that it would not authorize range of motion or paramedical services hours for Lattimore until the County received the applicable forms directly from the requesting physician or until such requesting physician agreed to verify the stated need.

The County issued another NOA, dated May 24, 2018, increasing Lattimore's hours to 97 hours and 17 minutes per month (May 2018 NOA). The May 2018 NOA stated that the increase was due to an authorization of 1 hour and 30 minutes per week for paramedical services. The County authorized this increase after it received "verification from one physician, Dr. [L.F.], for 1:30 hours/week" and a fraud investigator "cleared the authorization" of the December 2017 paramedical services request form from Dr. L.F. However, the County noted that, since Lattimore had not signed an authorization for Dr. J.S. to release Lattimore's information and records to the County, it could not verify the

6

information on the December 2017 range of motion services request forms and therefore could not authorize the requested hours. Instead of signing the release, Lattimore requested a hearing regarding the May 2018 NOA.

Dr. J.S. sent the County a letter, dated July 18, 2018, stating that he was "unable to honor the request to verify Ms. Lattimore's medical records" because "there is no signed authorized record release consent form for" Lattimore, and he is "not authorized to release any medical information to [the County] regarding her care without her written consent."

During the hearing before an ALJ on September 11, 2018, regarding the May 2018 NOA (September 2018 hearing), the County described its reduction of Lattimore's IHSS service hours from the pre-2017 reassessment level as "based upon [Lattimore's] credibility issues." The County sought authorization from Lattimore to contact her health care provider for verification. Lattimore refused to provide authorization, asserting documents previously submitted were sufficient.

In a decision adopted October 24, 2018, pursuant to the September 2018 hearing (October 2018 ALJ decision), the ALJ upheld the May 2018 NOA setting Lattimore's IHSS service hours at 97 hours and 17 minutes. The ALJ determined that Lattimore had not cooperated with the County's assessment of her need for IHSS services, and the record contained insufficient evidence that the County received the necessary and appropriate medical information for paramedical and range of motion services. Lattimore requested a rehearing of the October 2018 ALJ decision.

In a letter dated May 10, 2019 (May 2019 letter), the Chief ALJ granted Lattimore a rehearing of the October 2018 ALJ decision. The Chief ALJ asserted that the "[Manual of Policies and Procedures] § 30-757.14(g) provides that range of motion exercises may be authorized in a manner limited to what is prescribed in the regulation," and there is no requirement in the regulation that a recipient's health care provider fill out or sign a form describing the requested range of motion exercises or that the recipient sign a county

7

medical release form that allows the county to contact the health provider to provide verification. The Chief ALJ concluded the County "incorrectly denied [Lattimore] range of motion services based on her failure to cooperate."

C. *Events Between Subject Timeframes*

1. January 2019 Notice of Action

In November 2018, Lattimore sent a letter to the County requesting an increase in her IHSS service hours due to a change in her medical condition and because she was unable to use her hands (November 6, 2018 letter). Lattimore attached a photograph of her hands in casts, and signed her full name in cursive on the letter. Lattimore also enclosed six range of motion request forms, which were dated November 7, 2018, purportedly signed by Dr. J.S. (November 7, 2018 range of motion services request forms). These forms requested range of motion services substantially similar to those contained in her December 2017 range of motion services request forms. The County asked Lattimore to sign a release so they could communicate with Dr. J.S. about her request. Instead of signing the release, Lattimore requested a hearing.

On November 7, 2018, Lattimore went to NMC to have her wrists examined. The NMC notes from this visit with Dr. J.S. indicate that Lattimore had seen a different doctor, Dr. L., who had recommended hand therapy, but the therapy had not yet been approved (November 7, 2018 Clinic Note). A large section of the November 7, 2018 Clinic Note—where the doctor's diagnosis and treatment plan typically appear on other clinic notes from NMC—appears to have been redacted by hand. The nonredacted portions of the November 7, 2018 Clinic Note do not mention any surgical procedures.

On December 13, 2018, the County conducted its annual reassessment of Lattimore's condition and needs (2018 reassessment). During the 2018 reassessment, Lattimore refused the County employees access to the bedroom, kitchen, and bathroom

8

she claimed to use, and "refused to answer most questions."[3]  The County employees observed that Lattimore's casts were very clean and did not show signs of use.  The County employees also noted that Lattimore was able to easily stand up and sit down.  Although Lattimore claimed that "she could not use her hands at all" and "signed all documents with an X," timesheets the County received from Lattimore for pay periods covering October 1, 2018 through November 30, 2018, bore a signature and date that resembled Lattimore's signature and handwriting style in other documents.

The County issued a NOA dated January 15, 2019, reducing Lattimore's IHSS service hours (January 2019 NOA).  Lattimore requested a hearing to contest this reduction in hours.

During the March 26, 2019 hearing regarding the January 2019 NOA (March 2019 hearing), the ALJ observed that Lattimore was not wearing any casts or wraps and appeared to be able to fully use and manipulate her hands and fingers.

In a decision adopted June 3, 2019, regarding the January 2019 NOA pursuant to the March 2019 hearing (June 3, 2019 ALJ decision), the ALJ determined that Lattimore had no need for IHSS services and ordered the County to discontinue them.  The ALJ based his decision on Lattimore's ability to sign the October 1, 2018 to November 30, 2018 timesheets despite claiming to be unable to write, that Lattimore's wrappings did not appear dirty even though, allegedly, she had been wearing them for four to six weeks prior to the 2018 reassessment,[4] and that, "during the course of the hearing [Lattimore],

---

[3] Lattimore resided in her brother's house at the time of the 2018 reassessment.  On April 17, 2019, Lattimore's care provider informed the County that Lattimore's brother had evicted her.  The County stated that "[p]ublic criminal records reveal that [Lattimore]'s brother, who lives at the last physical address [she] provided, filed a restraining order against [her] on April 3, 2019."  Lattimore did not inform the County of her change in residence and did not respond to the County's requests that she verify her address.

[4] The ALJ observed:  "Had the claimant been wearing these casts and wraps on her arms for the 4 to 6 weeks prior to the December 13, 2018, assessment they would not

9

who appeared at the hearing with neither casts nor wrappings, had full use of both hands."

The County terminated Lattimore's IHSS services effective July 1, 2019, in accordance with the June 3, 2019 ALJ decision.

### 2. February 2019 Notice of Action

On February 26, 2019, Lattimore was arrested and charged in federal court with three counts of wire fraud, three counts of mail fraud, and two counts of supplemental security income fraud after "an active, years long fraud investigation" of Lattimore relating to her receipt and deposit of IHSS paychecks intended for her care provider. That day, the "[Department of Health Care Services] Investigator" informed the County that Lattimore was not wearing casts when she was arrested. Based on that information, the County issued a further NOA, again reducing Lattimore's IHSS service hours (February 2019 NOA). Lattimore requested a hearing to contest this further reduction in hours.

On March 6, 2019, two County employees separately encountered Lattimore at a food bank and reported that she had no casts on her hands or arms and appeared to be walking without any trouble and without any assistive devices. One of the employees observed Lattimore driving a gold vehicle, and no one else was in the car.

On March 8, 2019, Lattimore went to NMC for bilateral de Quervain and exterior tenosynovitis (March 2019 clinic visit). In the notes from this visit (March 2019 Clinic Note), Dr. J.S. states that Lattimore should continue to wear thumb spica splints, and sets forth the history of her use of the splints, including their placement on November 7, 2018, removal on February 14, 2019, and planned replacement on April 10, 2019, during which time, per Dr. L.'s recommendation, Lattimore is to wear the splints "at night." Most of

---

be so clean or white. Instead, they appeared to have the appearance of casts and wrappings that had been recently applied (i.e.[,] the day of the assessment). It was also noted during the hearing that these casts were of the removable type."

the copies in the record of the March 2019 Clinic Note have been redacted by hand to remove Dr. L.'s recommendation.

During the April 23, 2019 hearing regarding the February 2019 NOA (April 2019 hearing), Lattimore presented the redacted November 7, 2018 Clinic Note, a photograph of Lattimore with casts on her hands that was included with the November 6, 2018 letter, and the November 7, 2018 range of motion services request forms enclosed with the November 6, 2018 letter. Lattimore testified at the hearing that "Dr. JS put the casts on her arms on November 7, 2018," and "he signed the range of motion forms dated November 7, 2018." Lattimore did not explain a number of discrepancies in her evidence or why some of the information she submitted appeared to be redacted, nor did she provide information regarding the redacted content.

In a decision adopted June 4, 2019 regarding the February 2019 NOA pursuant to the April 2019 hearing, the ALJ sustained the County's authorization of IHSS service hours in the February 2019 NOA. In support of the County's decision to reduce her IHSS service hours, the ALJ cited to inconsistencies in the record, including Lattimore's ability to sign her full name despite asserting that she is unable to use both hands, and her refusal to answer questions regarding the redacted content in the November 7, 2018 Clinic Note.

D. *Decisions on Services During Second Subject Timeframe: April 10, 2019, to July 17, 2019*

On April 10, 2019, Lattimore went to NMC and requested bilateral thumb spica splints, which Dr. J.S. placed (April 2019 clinic visit). That day, Lattimore requested the maximum IHSS service hours of 283 per month, alleging a change in her circumstances, stating that she could not use her hands. Lattimore signed "her full signature in cursive" on the letter. The County requested Lattimore sign an authorization so that the County could speak with Lattimore's doctor and review her medical records. Instead of signing the requested form, Lattimore requested a hearing.

11

On June 10, 2019, Lattimore requested a hearing with respect to the County's response to her April 10, 2019 request for 283 IHSS service hours per month.

On July 17, 2019, an ALJ presided over the concurrent rehearing regarding the October 2018 ALJ decision—covering Lattimore's request for IHSS service hours for the December 18, 2017 to November 6, 2018 period—and hearing regarding Lattimore's April 10, 2019 request for the maximum IHSS service hours for the April 10, through July 17, 2019 timeframe based on Lattimore's alleged change in circumstances (collectively, the July 2019 hearing).[5]  During this hearing, Lattimore demonstrated that she had "unrestricted movement" of her fingers, was able to open and close her hands, and pick up objects.  The ALJ noted that, during the hearing, Lattimore's casts looked similar to the ones shown in a photo Lattimore dated April 10, 2019, did not have any odor, and appeared "very clean" despite having been worn, allegedly, "24 hours a day since May 2019."

In the December 2019 ALJ decision following the July 2019 hearing, the ALJ found, in weighing the evidence in the administrative record, that Lattimore's "verbal, written and physical actions" lacked credibility.  The ALJ cited to the observations of County employees, including that of other ALJ's; Lattimore's demonstrated ability to perform tasks Lattimore alleged she could not accomplish; Lattimore's alteration of medical records and submission of "conflicting medical evidence," and Lattimore's appearance in public without casts or wraps around her hands and with apparent full use of both hands.  As a result, the ALJ upheld the October 2018 ALJ decision sustaining the May 2018 NOA setting Lattimore's IHSS service hours at 97 hours and 17 minutes and

---

[5] During the July 2019 hearing, Lattimore also claimed that the discontinuation of her IHSS services pursuant to the June 3, 2019 ALJ decision was "incorrect."  Lattimore informed the ALJ that she "requested a hearing" on the termination of her IHSS, so the ALJ noted that that issue would "be addressed on a different day with a different judge." The ALJ subsequently denied Lattimore's claim contesting the discontinuation of her IHSS.  That decision is not within the scope of this appeal.

denied Lattimore's April 10, 2019 request for additional IHSS service hours due to insufficient credible evidence to support Lattimore's claims for the requested services.

E. *Proceedings on Petition for Writ of Mandate*

Pursuant to Code of Civil Procedure section 1094.5, Lattimore petitioned for a writ of administrative mandate challenging the December 2019 ALJ decision to the extent it upheld the October 2018 ALJ decision and denied Lattimore's April 10, 2019 request for additional IHSS service hours.[6]

During the hearing on April 1, 2022 (April 2022 hearing), the trial court asked Lattimore to point to factual evidence (specifically, medical records) in the record that demonstrated Lattimore was entitled to the requested paramedical and range of motion services for the Subject Timeframes. Lattimore relied primarily on the Chief ALJ's May 2019 letter granting her request for a rehearing of the October 2018 ALJ decision, rather than to medical records documenting her need for services.

Upon further prompting from the trial court, Lattimore identified specific pages from the administrative record for the trial court to review as evidence demonstrating her need for the claimed services.

Many of the documents identified by Lattimore are copies of correspondence between Lattimore and the County and copies of County forms, including the paramedical and range of motion request forms purportedly signed by Drs. L.F. and J.S., and copies of photos of Lattimore wearing casts or wraps on her hands and arms. Sixteen

---

[6] Lattimore's petition for writ of mandate and her appeal briefs request range of motion and paramedical services either through the "[p]resent date" or through "December 21, 2020." However, the December 2019 ALJ decision, the subject of Lattimore's petition for writ of mandate, covered only the Subject Timeframes. Moreover, the trial court confirmed with Lattimore that the only claims and periods at issue were those discussed during the October 24, 2018 ALJ decision and the additional IHSS service hours request Lattimore made on April 10, 2019. We therefore limit our review to Lattimore's request for paramedical and range of motion services during the Subject Timeframes. Any requested services for the periods after the Subject Timeframes are outside the scope of this appeal.

13

of the identified pages of the administrative record are "Clinic Notes," the first of three pages of an "Outpatient Neurology Follow-Up Note," and one "Operative Report" from NMC, which cover the June 2017 clinic visit, the November 2017 clinic visit (discussed *post* (pt. II.B.2.)), the December 2017 surgery, the March 2019 clinic visit, the April 2019 clinic visit (all except the November 2017 clinic visit discussed *ante* (pt. I.A.–I.D.), and a redacted list of medications.

After independent review of the administrative record, including the documents identified by Lattimore, the trial court found Lattimore failed to meet her burden of demonstrating need for the requested IHSS service hours for the Subject Timeframes, denied her petition pursuant to an order dated June 23, 2022, and entered judgment against her. This appeal followed.

## II. DISCUSSION

In her appeal of the trial court's order denying her petition, Lattimore contends the court erred in (1) concluding that Lattimore did not identify evidence in the record supporting her claims that she was entitled to paramedical and range of motion services; and (2) denying her the opportunity to argue her case at the hearing, not allowing her witness to testify, and deferring to the December 2019 ALJ decision.

A. *In-Home Supportive Services*

The IHSS program is governed by Welfare and Institutions Code sections 12300 et seq.[7] "The purpose of the legislation is to give the aged, blind and disabled the 'assistance and services which will encourage them to make greater efforts to achieve self-care and self-maintenance, whenever feasible, and to enlarge their opportunities for independence.' (§ 12002.) IHSS is specifically 'designed to avoid institutionalization of incapacitated persons.' " (*Reilly v. Marin Housing Authority* (2020) 10 Cal.5th 583, 588.)

---

[7] Unspecified statutory references are to the Welfare and Institutions Code.

14

The California Department of Social Services (CDSS) oversees the program and has promulgated regulations to assist in its implementation, which appear in its Manual of Policies and Procedures (MPP). (See State Dept. Social Services, Manual of Policies and Procedures; *Norasingh v. Lightbourne* (2014) 229 Cal.App.4th 740, 744 (*Norasingh*).) The IHSS program "provides assistance to those eligible aged, blind and disabled individuals who are unable to remain safely in their own homes without this assistance." (MPP, § 30-700.1.) Services and program benefits are administered by the applicable county (here Monterey) under the supervision of CDSS. (*Norasingh*, at pp. 744–745.) The county "process[es] applications for IHSS, determine[s] the individual's eligibility and needs, and authorize[s] services." (*Basden v. Wagner* (2010) 181 Cal.App.4th 929, 934 (*Basden*).)

Relevant here, the county may authorize (1) paramedical services, which are supportive services "persons could provide for themselves but for their functional limitations," and "include the administration of medications, puncturing the skin or inserting a medical device into a body orifice, activities requiring sterile procedures, or other activities requiring judgment based on training given by a licensed health care professional" (§ 12300.1; see also § 12300, subd. (b)); and (2) personal care services such as range of motion services that are comprised of (a) exercises "to restore mobility restricted because of injury, disuse or disease," and/or (b) maintenance exercises "to maintain function, improve gait, maintain strength, or endurance," "to maintain range of motion in paralyzed extremities," or to provide "assistive walking." (MPP, § 30-757.14(g); § 12300, subd. (c)(6).)

Prior to authorizing services, the county must receive "a certification from a licensed health care professional" that declares the recipient "is unable to perform some activities of daily living independently," and that without such services to assist with daily living activities, the "recipient is at risk of placement in out-of-home care." (§ 12309.1, subd. (a), (a)(2).) Prior to the initial authorization of IHSS services, the

15

county performs needs assessments. It annually reassesses IHSS recipients thereafter. (MPP, § 30-761.21; § 12301.1, subd. (b).)

The county also reassesses a recipient's need for services when the recipient notifies it of a change in circumstances necessitating an adjustment in service hours or when "there is other pertinent information which indicates a change in circumstances affecting the recipient's need for" IHSS. (MPP, § 30-761.219; § 12301.1, subd. (d).) The county categorizes the recipient's abilities, function, and dependence on assistance on a scale of one to five. (MPP, §§ 30-756.1, 30-756.2.) A recipient is categorized at a level five in one or more applicable service categories if the county determines that the recipient "cannot perform the function, with or without human assistance." (§ 12309, subd. (d)(5); MPP § 30-756.15.)

The county's social services staff determines "the need for services based on all of the following: [¶] [] The recipient's physical/mental condition, or living/social situation. [¶] (a) These conditions and situations shall be determined following a face-to-face contact with the recipient, if necessary. [¶] [(b)] The recipient's statement of need. [¶] [(c)] The available medical information. [¶] [(d)] Other information social service staff consider necessary and appropriate to assess the recipient's needs." (MPP, § 30-761.26.) In general, eligible IHSS recipients may not receive more than 195 hours of IHSS per month. (§ 12303.4, subd. (a).) However, "[s]everely impaired [IHSS] recipients" may receive up to 283 hours of IHSS per month. (*Basden*, *supra*, 181 Cal.App.4th at p. 934; § 12303.4, subd. (b).)

The statute governing the IHSS program grants the CDSS and the county authority to investigate, detect, and prevent "fraud in the provision or receipt of in-home supportive services" (§ 12305.82, subd. (a)), "to take appropriate administrative action relating to suspected fraud in the provision or receipt of in-home supportive services, and to refer suspected criminal offenses to appropriate law enforcement agencies for prosecution." (*Id.*, subd. (b).) The statute defines " '[f]raud' " as "the intentional deception or

16

misrepresentation made by a person with the knowledge that the deception could result in some unauthorized benefit to himself or herself or some other person. Fraud also includes any act that constitutes fraud under applicable federal or state law." (§ 12305.8, subd. (a).)

To facilitate the county's compliance with the regulations and statute, the recipient is responsible for, among other things, completing and making available to the county all documents required by the county to determine the recipient's eligibility and need for services. (MPP, § 30-760.1.) The recipient's obligations include "[c]ooperating with county fraud detection and prevention and quality assurance activities including case reviews and home visits," "[r]eporting all known facts which are material to [the recipient's] eligibility and level of need," and "[r]eporting within [10] calendar days of the occurrence, any change in any of these facts." (*Ibid*.)

The recipient must "cooperate to the best of his/her ability in the securing of medical verification which evaluates the following: [¶] [(a)] His/her present condition. [¶] [(b)] His/her ability to remain safely in his/her own home without IHSS services. [¶] [(c)] His/her need for either medical or nonmedical out-of-home care placement if IHSS were not provided. [¶] [(d)] The level of out-of-home care necessary if IHSS were not provided." (MPP, § 30-763.11.) Under the regulations, the recipient's "failure to cooperate as required in [s]ection 30-763.11 shall result in denial or termination of IHSS." (*Id.*, § 30-763.12.)

B. *Analysis*

A decision denying public assistance impacts fundamental vested rights. (*Frink v. Prod* (1982) 31 Cal.3d 166, 177.) In reviewing a decision impacting fundamental vested rights, a trial court exercises independent judgment, "reconsider[ing] the evidence presented at the administrative hearing and mak[ing] its own independent findings of fact." (*Ruth v. Kizer* (1992) 8 Cal.App.4th 380, 385 (*Ruth*).) When exercising its independent judgment, a trial court must afford " ' "a strong presumption

17

of . . . correctness" ' to administrative findings," and the party challenging the administrative decision bears the burden of convincing the court that the administrative findings are " ' "contrary to the weight of the evidence." ' " (*Fukuda v. City of Angels* (1999) 20 Cal.4th 805, 817 (*Fukuda*), citing *Bixby v. Pierno* (1971) 4 Cal.3d 130, 139.)

In reviewing such decisions, the appellate court examines the entire record, including the administrative record, to determine whether substantial evidence supports the trial court's findings. (*Worthington v. Davi* (2012) 208 Cal.App.4th 263, 277 (*Worthington*); *Calderon v. Anderson* (1996) 45 Cal.App.4th 607, 613.) " 'Substantial evidence' is relevant evidence that a reasonable mind might accept as adequate to support a conclusion. [Citation.] It is sufficient ' "if any reasonable trier of fact could have considered it reasonable, credible and of solid value." ' " (*San Diego Unified School Dist. v. Commission on Professional Competence* (2013) 214 Cal.App.4th 1120, 1142 (*San Diego USD*).)

The appellate court does not reweigh the evidence (*Norasingh*, *supra*, 229 Cal.App.4th at p. 753), but, rather, "resolve[s] all conflicts and indulge[s] all reasonable inferences in favor of the party who prevailed in the trial court." (*Worthington*, *supra*, 208 Cal.App.4th at p. 277.) " 'If there is substantial evidence, the judgment must be affirmed. [Citation.] We do not reweigh the evidence. Our inquiry "begins and ends with the determination as to whether there is substantial evidence, contradicted or uncontradicted, which will support the finding of fact." ' " (*San Diego USD*, *supra*, 214 Cal.App.4th at p. 1142.) "If such substantial evidence be found, it is of no consequence that the trial court believing other evidence, or drawing other reasonable inferences, might have reached a contrary conclusion." (*Bowers v. Bernards* (1984) 150 Cal.App.3d 870, 874, italics omitted.)

We review the interpretation of the governing statutes and regulations de novo, (*K.I. v. Wagner* (2014) 225 Cal.App.4th 1412, 1419 (*K.I.*)), and " 'reverse the judgment

of the [trial] court only if it is based on an erroneous conclusion of law.' " (*Worthington*, *supra*, 208 Cal.App.4th at p. 277.)

"[I]t is a fundamental principle of appellate procedure that a trial court judgment is ordinarily presumed to be correct and the burden is on an appellant to demonstrate, on the basis of the record presented to the appellate court, that the trial court committed an error that justifies reversal of the judgment." (*Jameson v. Desta* (2018) 5 Cal.5th 594, 608–609, citing *Denham v. Superior Court* (1970) 2 Cal.3d 557, 564.) Lattimore's status as a self-represented litigant does not exempt her from the rules of appellate procedure or relieve her burden on appeal. (*Nwosu*, *supra*, 122 Cal.App.4th at pp. 1246–1247.)

"Appellate briefs must provide argument and legal authority for the positions taken" (*Nelson v. Avondale Homeowners Assn.* (2009) 172 Cal.App.4th 857, 862), and a party who claims the trial court erred may not "rest on the bare assertion of error but must present argument and legal authority on each point raised." (*Boyle v. CertainTeed Corp.* (2006) 137 Cal.App.4th 645, 649.) We are not required to search the record for error ourselves (*Nwosu*, *supra*, 122 Cal.App.4th at p. 1246), and "[w]e are not bound to develop appellants' arguments for them." (*In re Marriage of Falcone & Fyke* (2008) 164 Cal.App.4th 814, 830.) When an appellant asserts a point on appeal " 'but fails to support it with reasoned argument and citations to authority,' " this court may treat the point as forfeited. (*Nelson*, at p. 862; see also *Nisei Farmers League v. Labor & Workforce Development Agency* (2019) 30 Cal.App.5th 997, 1018.)

### 1. IHSS Recipients' Obligation to Cooperate with CDSS

Lattimore cites no legal authority supporting her claim that the trial court erred when it determined that Lattimore failed to identify evidence in the record supporting her claims for paramedical and range of motion services during the Subject Timeframes.[8]

---

[8] The sole case Lattimore cites in her briefing on this point, *Ruth*, *supra*, 8 Cal.App.4th at page 385, does not assist her. The court in *Ruth* overturned the trial

Accordingly, Lattimore has forfeited this contention on appeal. Furthermore, we do not agree with Lattimore that the trial erred on this point.

In terms of specific evidence in the record supporting her claim, Lattimore relies heavily on the May 2019 letter from the Chief ALJ, both in the present appeal and in the trial court and administrative proceedings that followed the issuance of that letter. Her reliance on the May 2019 letter is misplaced.

The May 2019 letter does not substantiate Lattimore's claim that she required paramedical and range of motion services during the Subject Timeframes. It does not diagnose or assess Lattimore's alleged medical conditions, discuss any medical records or other documents she submitted, or state that she is entitled to paramedical and range of motion services. The letter sets forth the Chief ALJ's interpretation of the procedural requirements in the MPP. Indeed, during the July 2019 hearing, the ALJ explained, and Lattimore acknowledged, that the inclusion of the phrase " 'based upon her failure to cooperate' " means that the Chief ALJ was not instructing the CDSS to grant the requested hours, only that the denial of those hours was incorrect if based solely on Lattimore's failure to cooperate.

In fact, the MPP does require IHSS recipients to cooperate with the county's assessment process. Pursuant to section 30-763.11 of the MPP, an IHSS recipient is required "to *cooperate to the best of his/her ability in the securing of medical verification which evaluates the following:* [¶] [(a)] His/her present condition. [¶] [(b)] His/her ability to remain safely in his/her own home without IHSS services. [¶] [(c)] His/her need for either medical or nonmedical out-of-home care placement if IHSS were not

court's decision on the grounds that the Medi-Cal recipients failed to present the requisite documentation to support their requests for the equipment at issue. (*Id*. at p. 390.) As discussed *post* (pt. II.B.2.), Lattimore's appeal faces a similar issue here.

20

provided.  [¶]  [(d)] The level of out-of-home care necessary if IHSS were not provided."[9] (MPP, § 30-763.11, italics added.)  Moreover, the MPP clearly states that a recipient's "*failure to cooperate* as required in [s]ection 30-763.11 *shall result in denial or termination of IHSS.*"  (*Id.*, § 30-763.12, italics added.)

"The interpretation of a regulation, like the interpretation of a statute, is, of course, a question of law" and "the ultimate resolution of such legal questions rests with the courts."  (*Carmona v. Division of Industrial Safety* (1975) 13 Cal.3d 303, 310.)  While an administrative agency's interpretation, including that of ALJ's supporting the administrative agency, of its governing regulations "is entitled to 'great weight and deference' " (*Norasingh*, *supra*, 229 Cal.App.4th at p. 753), this "principle of deference is not without limit; it does not permit the agency to disregard the regulation's plain language."  (*Motion Picture Studio Teachers & Welfare Workers v. Millan* (1996) 51 Cal.App.4th 1190, 1195.)  An agency's construction of its own regulation no longer controls if "it is clearly erroneous or inconsistent with the plain language of the regulation."  (*Ibid.*)

The MPP's language clearly requires IHSS recipients to cooperate with the county, and just as clearly sets forth denial or termination of IHSS as the consequence of an IHSS recipient's failure to cooperate.

### 2.  Evidence of Need for Paramedical and Range of Motion Services

Even apart from Lattimore's refusal to cooperate with the County's assessments and investigation, the record contains substantial evidence to support the trial court's finding that Lattimore did not elicit "any evidence in the record that indicates that the

---

[9] Reading sections 30-761.26 and 30-760.1 of the MPP together, a recipient must complete and make available to the County all documents the County "consider[s] necessary and appropriate to assess the recipient's" eligibility and need for IHSS.  (MPP, §§ 30-761.26, 30-760.1.)  Given the County's well-documented and well-substantiated concerns regarding Lattimore's credibility and the authenticity of her documents, it was reasonable for the County to require Lattimore to sign releases so the County could speak directly with Lattimore's doctors to better assess and to verify Lattimore's claims.

weight of the evidence demonstrates that [she] was entitled to the range of motion and paramedical services hours she sought from the County." We agree with the trial court's conclusion that Lattimore failed to meet her burden of proving that the December 2019 ALJ decision was "contrary to the weight of the evidence."

While many of the medical documents in the record are duplicates, we can summarize the unique medical records as follows: (1) an NMC Clinic Note describing the June 2017 clinic visit regarding Lattimore's feet; (2) the first (out of three) pages of an NMC Outpatient Neurology Follow-Up Note for the November 2017 clinic visit that lists Lattimore's vital signs, but not the reason for or outcome of the visit; (3) an NMC Operative Report describing the December 2017 surgery; (4) a heavily redacted November 7, 2018 Clinic Note discussing Lattimore's wrists and hand therapy; (5) the March 2019 Clinic Note regarding Lattimore's "bilateral de Quervain" and discussing removal, placement, and nighttime wear of thumb spica splints; and (6) an NMC Clinic Note describing the April 2019 clinic visit during which Lattimore requested bilateral thumb spica splints.[10]

Lattimore claimed to have "undergone six major surgeries," including "surgery on her arms on November 7, 2018," and submitted "thousands of pages" of medical records

[10] Lattimore attached to her opening brief partial copies of medical records dated November 8, 2019, and onward, two signed paramedical services request forms from July 2022, and a single page purportedly from the decision regarding her challenge to the discontinuation of her IHSS discussed *ante* (fn. 6). Pursuant to California Rules of Court, the record on appeal is "[a] record of the written documents from the [trial] court proceedings," (Cal. Rules of Court, rule 8.120(a)(1)) the administrative record, (*id*., rule 8.120(a)(2)) and the reporter's transcript of the hearing before the trial court. (*Id*., rule 8.120(b).) An appellant's brief may only address matters in the record. (*Id*., rule 8.204(a)(2)(C), (d).) The general rule of appellate review is that the reviewing court examines the correctness of a judgment or order based upon the record before the trial court for consideration. (*In re Zeth S.* (2003) 31 Cal.4th 396, 405.) Documents not before the trial court cannot be included as part of the record on appeal and thus must be disregarded as beyond the scope of appellate review." (*Glassman v. Safeco Ins. Co. of America* (2023) 90 Cal.App.5th 1281, 1307.) We therefore will not consider Lattimore's arguments that rely on such documents.

to the County and to the ALJ's presiding over her requested hearings and rehearings. However, as the trial court observed, the administrative record does not evidence any of these alleged additional surgeries during the Subject Timeframes, nor does it show a voluminous production of medical records. The only record of an operation in the record documents Lattimore's December 2017 surgery, while the clinic notes in the record discuss only physical therapy and other nonsurgical and surgical recommendations.

The medical documents in the record are insufficient to support Lattimore's claims for the range of motion and paramedical services she asserts she needed during the first Subject Timeframe. They do not show evidence of the folliculitis that allegedly necessitates the services described in the December 2017 paramedical services request form. Nor do the medical records in the record show evidence of the rotator cuff disease, carpal tunnel, bursa bursitis, strain or IT band issues, lumbar strain, cervical disc disease, or shoulder impingement that allegedly necessitate the variety of services documented in the December 2017 range of motion services request forms.

The June 5, 2017 clinic note indicates that Lattimore is "recuperating from a patellar tendon and right medial meniscus repair," but none of the other medical records indicate any new meniscus injury thereafter, even though a meniscus tear is listed six months later as one of Lattimore's medical conditions in a December 2017 range of motion services request form. None of the medical records include information that would indicate that any of the medical conditions documented in the medical records and claimed in the December 2017 paramedical services request forms, such as DeQuervain's Tenosynovitis, Achilles issues, and plantar fasciitis, are so severe as to suggest they will be with Lattimore for her "lifetime," the duration for which Dr. J.S. indicated Lattimore would require the requested services.

The medical documentation in the record is likewise insufficient to support Lattimore's claims that she should be ranked a level five and granted 283 IHSS service hours, the maximum allowable under the statute and the MPP, for the second Subject

23

Timeframe.  "The determination whether the individual is entitled to the higher benefit level requires a factually intensive evaluation of the assistance needed for numerous specified daily living tasks."  (*K.I.*, *supra*, 225 Cal.App.4th at p. 1416.)  The only medical record that falls within the April to July 2019 timeframe does not indicate a disability or reduction in function such that Lattimore would be unable to perform the functions, with or without human assistance, that the statute and MPP require in order to rank an IHSS recipient as a "five."  Nor does it suggest such *severe impairment* as to require the receipt of the maximum allowable number of IHSS service hours.  (*Basden*, *supra*, 181 Cal.App.4th at p. 934.)  Indeed, other medical records, particularly the March 2019 Clinic Note just a month before Lattimore's April 10, 2019 request, indicate that the thumb spica splints needed to be worn only at night, that they can and may be removed and, in fact, were removed for a two-month period.

Lattimore did not point the trial court or this court to any additional medical records, nor does the record reveal any documents that would support her claim that her medical condition during the Subject Timeframes necessitates the authorization of the requested range of motion and paramedical services.

In addition, observations of Lattimore's own conduct during reassessments and hearings during the Subject Timeframes likewise cast doubt on the existence and extent of Lattimore's documented medical conditions during the Subject Timeframes.  During the 2017 reassessment, Lattimore was able to grip her hands tightly, use her hands to reach up to adjust her glasses and take them on and off, get up and walk around without difficulty, and reach and lean diagonally across her body without any apparent discomfort.  Lattimore attested to her ability to "brush her teeth, write and lift some objects that are not too heavy."  Lattimore demonstrated her ability to brush her teeth and confirmed her ability to write to an ALJ during the February 2018 hearing.  As the ALJ for the February 2018 hearing noted, "it was unclear why [Lattimore] is able to brush her

24

teeth, but not able to feed herself or wipe herself," and "as [she] is able to write and brush [her] teeth, she should be able to perform most of the feeding tasks."

Lattimore testified, "before November 7, 2018," she used "removable handguards that attached by Velcro and could be taken on and off by pulling the Velcro straps" to support her thumb. According to the County employees' observations during the 2017 reassessment, Lattimore wore this brace only on her left hand, which is consistent with the NMC Operative Report describing the December 2017 surgery. Lattimore did not have casts or splints on her hands during the period from December 16, 2017, to November 7, 2018, and the County sought to discuss with Lattimore's doctor why she was unable to perform some of the treatments listed in the paramedical and range of motion forms herself. But Lattimore and Dr. J.S. stymied the County's efforts to speak to him regarding her medical conditions.

During the July 2019 hearing, County employees and the ALJ observed Lattimore manipulating paperwork on her own, waving her fingers, picking up a water bottle, picking up a coffee cup using four of her fingers, and moving objects around. The ALJ for the July 2019 hearing observed, Lattimore "demonstrated how she had unrestricted movement of all four fingers, demonstrated they opened and closed to her palm, and how she could pick up a water bottle by using both hands, rather than gripping it with one hand because the cast interfered with closing the hand around the circumference of the water bottle." The record contains no explanation by Lattimore of the inconsistencies between her stated inabilities and her observed abilities.

Furthermore, the County granted Lattimore two hours per week of IHSS service hours for feeding, and two hours and 20 minutes per week of IHSS service hours for bathing, oral hygiene, and grooming. The record contains no explanation why Lattimore requires additional feeding services beyond those already granted, and how any such services would be considered range of motion services, as opposed to feeding services as set forth in the statute. (§ 12300, subd. (c)(7).) Under the applicable regulations, range

25

of motion services are limited to exercises that are intended to *restore* mobility or maintenance exercises intended to *retain* mobility (MPP, § 30-757.14(g)), which would not include feeding. Nor has Lattimore explained or identified any evidence in her briefing why she requires additional shampooing, conditioning, and blow drying services beyond those granted in the "[b]athing, oral hygiene, and grooming" category of IHSS, and how those services would require the training and judgment of a medical professional such that they would rightfully fall under the paramedical category of supportive services as opposed to the personal care services category. (§ 12300, subd. (c)(2).) In addition, Lattimore does not present any evidence undermining the County's position (and the finding in the December 2019 ALJ decision) that electro-orthostim services, including the use of a TENS unit, are "not compensable" under the range of motion category of services. Use of the TENS unit to provide electro-orthostim services is a pain relief treatment (which is not compensable), rather than restoration or retention of mobility.

We decide the trial court did not err in concluding that the record does not support Lattimore's claims for paramedical and range of motion services. Lattimore has failed to meet her burden of showing that the trial court's decision was contrary to the weight of the evidence in the record.

Although it is not necessary to our conclusion, we observe that the record contains considerable evidence of Lattimore's history of providing fraudulent or redacted documents to the County. For example, in addition to providing falsified Marina PT records to the County, Lattimore refused to answer the County's and the ALJ's questions regarding the content of the redacted portions of other medical records, including with respect to the redacted November 7, 2018 and March 2019 Clinic Notes. Lattimore's alteration of her medical records removed information that could help the County assess her needs, including, with respect to the March 2019 Clinic Note, information that

26

indicated that the thumb spica splints need only be worn at night and were removable.[11] The trial court could reasonably infer from the language redacted the rationale for the redaction, that Lattimore was trying to hide the truth of her condition to obtain the requested services.

Lattimore also heavily redacted the November 7, 2018 Clinic Note, obscuring the portion of the Clinic Note that would typically indicate the doctor's diagnosis and treatment plan for the patient, for a visit to NMC that occurred on the same day she claims she had another surgical procedure on her hands. These fragmentary excerpts do not allow for an accurate evaluation of Lattimore's medical condition or comparison with her claimed need for paramedical and range of motion services. Relatedly, Lattimore did not explain to the ALJ's, the trial court, or this court, how she was able to sign her full signature to a letter requesting IHSS services on November 6, 2018, despite claiming in that same letter that she was "unable to use both hands" and attaching to it a photo of her hands in casts. Nor did she explain how she included the range of motion request forms purportedly signed and dated November 7, 2018, by Dr. J.S. with the November 6 letter.

We decide the trial court did not err in concluding Lattimore failed to carry her burden of demonstrating evidence in the record sufficient to support her claim for the requested paramedical and range of motion services during the Subject Timeframes.

3. Fair Trial Claims

Lattimore asserts that the trial court committed procedural error by exhibiting bias in not allowing Lattimore to present her case, by not allowing her to present a witness introduced for the first time at the trial court hearing, and by deferring to the December 2019 ALJ decision. Although Lattimore references pages in the reporter's transcript to

---

[11] Although Lattimore alleged at the April 2022 hearing that her care provider mistakenly redacted this language, rather than language regarding a different medical condition, that the same language is redacted in multiple ways over multiple copies strongly suggests that the redaction was intentional rather than accidental.

support her claim of procedural errors, she does not develop the points with citation to legal authority or argument. Accordingly, Lattimore has forfeited these contentions on appeal. In any event, our review of the record does not support her claims of error.

With respect to Lattimore's assertion that the trial court denied her "the complete chance to tell and prove" her case, the reporter's transcript pages she cites do not support her claim. To the contrary, at the hearing Lattimore was able to describe the paramedical and range of motion forms she submitted, and the trial court prompted Lattimore to identify any medical records that would support the claims for the requested services. The trial court provided Lattimore with multiple opportunities to elicit such records and allowed Lattimore extra time in the hearing to gather her documents. The trial court told Lattimore that it would "go back and take a look" and "go through the entire record, but pay particularly close attention to the pages" Lattimore identified. There is no evidence in the portions of the record Lattimore cites on appeal that the trial court did not afford her "the complete chance to tell and prove" her case.

Nor do the pages Lattimore cites indicate any bias on the part of the trial court. When alleging bias, a party must allege concrete facts that demonstrate the trial court was biased. (*Shakin v. Board of Medical Examiners* (1967) 254 Cal.App.2d 102, 117; *Andrews v. Agricultural Labor Relations Bd.* (1981) 28 Cal.3d 781, 792.) Although Lattimore cites to the entirety of the reporter's transcript in support of her claim of bias, she does not point to any specific statements in support of her claim, and we have not identified any.

In addition, the trial court did not err in not allowing Lattimore's care provider to testify at the hearing. As to this assertion of error, Lattimore makes only a blanket statement, without any citation to authority. Moreover, as Lattimore herself acknowledged in her petition for writ of mandate, Code of Civil Procedure section 1094.5, subdivision (e) only permits the admission of "extra-record evidence" that "in the exercise of reasonable diligence, could not have been produced" at the administrative

28

hearing.  (Code of Civ. Proc., § 1094.5, subd. (e).)  A party " 'may not complain of the absence of a witness unless [the party] had made a showing of due diligence to obtain the attendance of the witness.' "  (*Nick v. Department of Motor Vehicles* (1993) 12 Cal.App.4th 1407, 1417.)

Lattimore does not establish that she made such a showing.  Further, she does not acknowledge that, in response to CDSS's objection to the introduction of Lattimore's care provider as a witness and the trial court sustaining the objection, she conceded the point and told the trial court it was "fine."  Lattimore therefore forfeited her right to challenge the matter on appeal.  (*Sperber v. Robinson* (1994) 26 Cal.App.4th 736, 742–743.)

Finally, the reporter's transcript page Lattimore references in support of her claim that the trial court erred by "defer[ring]" to the December 2019 ALJ decision only contains CDSS's argument regarding Lattimore's lack of cooperation, and the trial court giving Lattimore the opportunity to respond to that contention.  It does not include any intimation that the trial court did not exercise independent judgment.

Nevertheless, as discussed *ante* (pt. II.B.), even when exercising its independent judgment, a trial court can and should accord a "strong presumption of correctness" to the findings in the administrative decision it reviews.  (*Fukuda*, *supra*, 20 Cal.4th at p. 817.) "Independent judgment review ' "does not mean that the preliminary work performed by the administrative board in sifting the evidence and in making its findings is wasted effort.  . . .  [I]n weighing the evidence the courts can and should be assisted by the findings of the board." ' "  (*San Diego USD*, *supra*, 214 Cal.App.4th at p. 1141, quoting *Fukuda*, at p. 812.)  The trial court did not err to the extent it deferred to the December 2019 ALJ decision.

## III.  DISPOSITION

The judgement is affirmed.  Respondent is awarded costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(1).)

29

_____
Danner, J.

WE CONCUR:


_____
Bamattre-Manoukian, Acting P. J.



_____
Bromberg, J.



**H050171**
*Lattimore v. Dept. of Social Services*